The **AMERICAN TOBACCO COMPANY, INC.,** Petitioner

v.

Jeannie **GRINNELL,** individually and as independent executrix of the Estate of Wiley Grinnell, Jr., deceased, Wiley and Frances Grinnell, Sr., and Kevin Grinnell, Respondents.

No. 94–1227.

Supreme Court of Texas.

Argued Feb. 13, 1996.

Decided June 20, 1997.

Rehearing Overruled Oct. 2, 1997.

Jana F. Lohse, Sam W. Cruse, Houston, Thomas E. Riley, Steven L. Vollins, Thomas E. Bezanson, New York, NY, Hubert Oxford, III, Beaumont, for Petitioner.

David B. Gaultney, Dewey J. Gonsoulin, Beaumont, Jonathan Massey, Washington, DC, Jorge Vega, Harry G. Potter, III, Austin, Lawrence H. Tribe, Cambridge, MA, for Respondents.

CORNYN, Justice, delivered the opinion of the Court, in which PHILLIPS, Chief Justice, and GONZALEZ, SPECTOR, BAKER and ABBOTT, Justices, join.

In this wrongful death case, we confront an issue with profound health and public policy consequences: whether "common knowledge" of the health risks of cigarette smoking relieves tobacco companies of any duty to warn smokers of those risks. Applying our usual summary judgment standard, we conclude that the defendant has conclusively established the defense of common knowledge with regard to the general health risks of smoking. We also conclude, however, that the defendant has not conclusively established the common knowledge defense with regard to the addictive nature of cigarettes. Accordingly, we conclude that the defendant is entitled to summary judgment on most, but not all of the plaintiffs' claims, and remand the surviving claims to the trial court for further proceedings.

In 1952, nineteen-year-old Wiley Grinnell began smoking Lucky Strikes, cigarettes manufactured by the American Tobacco Company. Almost a year later, Grinnell changed to Pall Malls, also manufactured by American. After smoking for approximately thirty-three years, Grinnell was diagnosed with lung cancer in July 1985. Shortly thereafter, he filed this lawsuit. He died less than a year later. Grinnell's family continued this suit after his death, adding wrongful death and survival claims. The family alleges that American failed to warn of, and actively concealed, facts that it knew or should have known, including the facts that Grinnell could quickly become addicted to cigarettes and that his smoking could result in injury or death from the cancer-causing ingredients if he used the cigarettes as American intended. They also allege that, even though American knew or should have known that its cigarettes were dangerous and could not be used safely, American represented to consumers that cigarettes were not harmful, dangerous, or capable of causing injury.

The Grinnells assert essentially six interrelated claims: (1) strict liability design, marketing, and manufacturing defect; (2) negligent testing, failure to warn, misrepresentation, and design; (3) affirmative fraudulent misrepresentation and fraudulent concealment; (4) Deceptive Trade Practices Act violations for failure to disclose and deceptive advertising; (5) breach of express and implied warranties; and (6) civil conspiracy. They also assert claims based on violations of sections 321, 389, 519, and 520 of the *Restatement (Second) of Torts* (1965, 1977). The gravamen of their complaint is that Grinnell began smoking because American did not warn him of the potential dangers of smoking, and once he began smoking he could not stop because he became addicted to cigarettes.

In several motions for summary judgment, American asserted that it conclusively defeated at least one element of each of the Grinnells' claims and that many of the claims were preempted by federal law. In the first motion, American asserted that the Federal Cigarette Labeling and Advertising Act of 1965 preempted the Grinnells' claims for American's post–1965 activities based on inadequate warnings in advertising and promotional materials. American's second motion asserted that federal law preempted all of the Grinnells' claims based upon post–1965 activity. In its "renewed" motion, American asserted that all of the Grinnells' claims were preempted by the Public Health Cigarette Smoking Act of 1969 or otherwise barred by Texas law. The trial court granted all three motions and dismissed the Grinnells' suit. The court of appeals reversed the trial court's judgment and remanded the entire case. 883 S.W.2d 791.

When reviewing a summary judgment, we follow these well-established rules: (1) The movant has the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law; (2) in deciding whether there is a disputed material fact issue precluding summary judgment, evidence favorable to the nonmovant will be taken as true; and (3) every reasonable inference must be indulged in favor of the nonmovant and any doubts must be resolved in favor of the nonmovant. *Nixon v. Mr. Property Management Co.,* 690 S.W.2d 546, 548–49 (Tex.1985). Summary judgment is proper if the defendant disproves at least one element of each of the plaintiff's claims, *Doe v. Boys Clubs of Greater Dallas, Inc.,* 907 S.W.2d 472, 476–77 (Tex.1995), or establishes all elements of an affirmative defense to each claim. *Montgomery v. Kennedy,* 669 S.W.2d 309, 310–11 (Tex.1984). We first address those claims to which defenses other than federal preemption apply.

## I. Common–Law Duties

### A. Strict Liability

The Grinnells allege that cigarettes are both defective and unreasonably dangerous under section 402A of the *Restatement (Second) of Torts.* Specifically, they assert that American's cigarettes are (1) defectively designed because ingredients found in cigarettes cause cancer, addiction, and disease, (2) defectively marketed, because the cigarette packages contain inadequate warnings, and (3) defectively manufactured because cigarettes contain pesticide residue. In his deposition taken one month before his death,

Grinnell testified that had he known of the dangers inherent in cigarettes he would never have started smoking in the first place.

■ In Texas, section 402A of the *Restatement (Second) of Torts* governs claims for strict liability in tort. *Firestone Steel Prods. Co. v. Barajas*, 927 S.W.2d 608, 613 (Tex. 1996); *McKisson v. Sales Affiliates, Inc.*, 416 S.W.2d 787, 788–89 (Tex.1967). Section 402A provides:

> (1) one who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if
>
> (a) the seller is engaged in the business of selling such a product, and
>
> (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

RESTATEMENT (SECOND) OF TORTS § 402A (1965). A product may be unreasonably dangerous because of a defect in marketing, design, or manufacturing. *Caterpillar, Inc. v. Shears*, 911 S.W.2d 379, 382 (Tex.1995); *Technical Chem. Co. v. Jacobs*, 480 S.W.2d 602, 604–05 (Tex.1972). The Grinnells allege that the cigarettes sold by American were unreasonably dangerous due to each of the three types of defect. We address each of the Grinnells' claims in turn.

### 1. Marketing Defect

■ A defendant's failure to warn of a product's potential dangers when warnings are required is a type of marketing defect. *Caterpillar, Inc.*, 911 S.W.2d at 382; *Lucas v. Texas Indus., Inc.*, 696 S.W.2d 372, 377 (Tex.1984). The existence of a duty to warn

of dangers or instruct as to the proper use of a product is a question of law. *Firestone Steel*, 927 S.W.2d at 613; *General Motors Corp. v. Saenz*, 873 S.W.2d 353, 356 (Tex. 1993). Generally, a manufacturer has a duty to warn if it knows or should know of the potential harm to a user because of the nature of its product. *Bristol–Myers Co. v. Gonzales*, 561 S.W.2d 801, 804 (Tex.1978). Nevertheless, this Court has recognized that there is no duty to warn when the risks associated with a particular product are matters "within the ordinary knowledge common to the community." *Joseph E. Seagram & Sons, Inc. v. McGuire*, 814 S.W.2d 385, 388 (Tex.1991) (holding that no legal duty exists to warn of the health risks of alcohol consumption because such risks are common knowledge). American argues that it had no duty to warn Grinnell of the risks associated with smoking its cigarettes because the dangers of smoking were common knowledge when Grinnell began smoking in 1952.

Comments i and j to *Restatement* section 402A incorporate common knowledge into the analysis of whether a product is "unreasonably dangerous" under that section.[1] Comment i, which defines "unreasonably dangerous," forecloses liability against manufacturers unless a product is dangerous to an extent beyond that which would be contemplated by the ordinary consumer with knowledge common to the community:

> Many products cannot possibly be made entirely safe for all consumption, and any food or drug necessarily involves some risk of harm, if only from over-consumption.... That is not what is meant by "unreasonably dangerous" in this Section. *The article sold must be dangerous to an*

---

1. The recently adopted final draft of the *Restatement (Third) of Torts: Products Liability* does not use the "unreasonably dangerous" formulation, but takes a functional approach to defining product defect. RESTATEMENT (THIRD) OF TORTS: PRODUCTS LIABILITY §§ 1, 2 (Proposed Final Draft, 1997). Section 1 establishes liability for harm to people or property caused by a "defective product." Section 2 defines a product as defective when "at the time of sale or distribution, it contains a manufacturing defect, is defective in design, or is defective because of inadequate instructions or warnings." The *Restatement* does not preclude liability for any particular group of products:

"Common and widely distributed products such as alcoholic beverages, tobacco, firearms, and above-ground swimming pools may be found to be defective only upon proof of the requisite conditions in Subsection (a), (b), or (c)[defective manufacture, design, warning]. If such products are defectively manufactured or sold without reasonable warnings as to their danger when such warnings are appropriate, or if reasonable alternative designs could have been adopted, then liability under §§ 1 and 2 [for selling or distributing a defective product] may attach." *Id.* at § 2 cmt. d.

*extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics.... Good tobacco is not unreasonably dangerous merely because the effects of smoking may be harmful; but tobacco containing something like marijuana may be unreasonably dangerous.*
RESTATEMENT (SECOND) OF TORTS § 402A cmt. i (1965)(emphasis added). Comment j excuses a seller from the duty to warn about dangers that are generally known and recognized:

> In order to prevent the product from being unreasonably dangerous, the seller may be required to give directions or warning, on the container, as to its use.... But a seller is not required to warn with respect to products, or ingredients in them, which are only dangerous, or potentially so, when consumed in excess quantity, or over a long period of time, *when the danger, or potentiality of danger, is generally known and recognized.* ... [T]he dangers of alcoholic beverages are an example....

*Id.* § 402A cmt. j (1965)(emphasis added).[2]

Common knowledge, in the context of comments i and j, connotes a general societal understanding of the risks inherent in a specific product or class of products. *Seagram,* 814 S.W.2d at 388. In *Seagram* we also emphasized that the standard for finding common knowledge as a matter of law is a strict one. First holding that the term "common knowledge" encompasses "those facts that are so well known to the community as to be beyond dispute," *id.,* we then noted:

> Because Seagram is asking this court to determine common knowledge as a matter

of law, we find the judicial notice rule helpful in providing a standard. Compare 33 S. Goode, O. Wellborn, III & M. Sharlot, Guide to Texas Rules of Evidence § 201.2 (Tex.Prac.1988)(requiring "high degree of indisputability" as prerequisite to judicial notice) with *Brune v. Brown Forman Corp.,* 758 S.W.2d 827, 830–31 (Tex.App.—Corpus Christi 1988, writ denied)("common knowledge is information known by the public generally based upon indisputable facts").

*Id.* at 388 n. 6.

■ Thus, common knowledge is an extraordinary defense[3] that applies only in limited circumstances. As the court in *Brune* noted, common knowledge encompasses only those things "so patently obvious and so well known to the community generally, that there can be no question or dispute concerning their existence." *Brune,* 758 S.W.2d at 830–31. We will find common knowledge as a matter of law only when the standard set out in *Seagram* is met. It is not met in all respects here.

■ For example, we do not find the dangers of alcohol and cigarettes, or the public's awareness of those respective dangers, to be commensurate. Unlike Seagram & Sons, which did not dispute the health dangers of prolonged alcohol use, *Seagram,* 814 S.W.2d at 387, the tobacco industry, including American, actively disputed that cigarettes posed any health risk at the time Grinnell began smoking in 1952. Indeed, the industry continues to dispute the health risks of smoking and the addictive nature of cigarettes, before

---

**2.** We note that, although not applicable to this case, the Texas Legislature has codified comments i and j of section 402A of the *Restatement.* TEX. CIV. PRAC. & REM.CODE § 82.004 (applicable to cases filed after September 1, 1993). This statute provides that a manufacturer or seller is not liable if (1) the product is inherently unsafe and is known to be unsafe by the ordinary consumer possessing knowledge common to the community, and (2) the product is a consumer product, such as tobacco, as identified in comment i to section 402A of the *Restatement (Second) of Torts. Id.* § 82.004(a)(1), (2). This section applies to all design and marketing defects, but not to actions

based on a manufacturing defect or breach of an express warranty. *Id.* § 82.004(b).

**3.** As we have stated, whether the risks associated with a product are common knowledge is one factor courts consider when determining the existence of a duty to warn. Common knowledge is referred to as a defense, *see Seagram,* 814 S.W.2d at 388 n. 5, because the product user has the burden to prove that the seller had a duty warn of a product's danger, while the product seller may assert that no such duty existed because of the common knowledge regarding such danger.

Congress, in the national press,[4] and even at oral argument before the Court in this case.[5] Despite this ongoing "dispute," we are bound to apply the rule that whether knowledge has become common to the community is an objective determination. *See Caterpillar, Inc. v. Shears,* 911 S.W.2d 379, 383 (Tex.1995).

The party asserting the common-knowledge defense must establish that the dangers attributable to alcohol, tobacco, or other products were a matter of common knowledge when the consumer began using the product. Based on the summary judgment record, we hold American established that the general ill-effects of smoking were commonly known when Grinnell started smoking in 1952. However, we also hold that American did not establish that the addictive quality of cigarettes was commonly known when Grinnell began smoking in 1952.

■ Regarding the general health risks associated with smoking, the Tennessee Supreme Court held as early as 1898 that these risks were "generally known." *Austin v. State,* 101 Tenn. 563, 48 S.W. 305, 306 (1898), *aff'd as modified sub nom. Austin v. Tennessee,* 179 U.S. 343, 21 S.Ct. 132, 45 L.Ed. 224 (1900). On certiorari, the United States Supreme Court observed:

> [W]e should be shutting our eyes to what is constantly passing before them were we to affect an ignorance of the fact that a belief in [cigarettes'] deleterious effects, particularly upon young people, *has become very general,* and that communications are constantly finding their way into the public press denouncing their use as fraught with great danger....

179 U.S. at 348, 21 S.Ct. at 134 (emphasis added). Other early courts also recognized

the harmful effects of smoking cigarettes. *Gundling v. City of Chicago,* 176 Ill. 340, 52 N.E. 44, 45 (1898) (cigarettes are "deleterious" and "injurious"), *aff'd,* 177 U.S. 183, 20 S.Ct. 633, 44 L.Ed. 725 (1900); *State v. Nossaman,* 107 Kan. 715, 193 P. 347, 348 (1920) (dangers of smoking and deleterious effects of cigarettes are common knowledge); *Liggett & Myers Tobacco Co. v. Cannon,* 132 Tenn. 419, 178 S.W. 1009, 1010 (1915) (cigarettes are "possessed of no virtue, being bad inherently"). More recently, courts have similarly acknowledged that the inherent dangers of smoking cigarettes are within the community's common knowledge. *Allgood v. R.J. Reynolds Tobacco Co.,* 80 F.3d 168, 172 (5th Cir.1996), *cert. denied,* — U.S. —, 117 S.Ct. 300, 136 L.Ed.2d 218 (1996) ("[T]he dangers of cigarette smoking have long been known to the community."); *Roysdon v. R.J. Reynolds Tobacco Co.,* 849 F.2d 230, 236 (6th Cir.1988) (" '[T]obacco has been used for over 400 years and ... its characteristics have also been fully explored. Knowledge that cigarette smoking is harmful to health is widespread and can be considered part of the common knowledge of the community.' "); *Paugh v. R.J. Reynolds Tobacco Co.,* 834 F.Supp. 228, 231 (N.D.Ohio 1993) ("Much as in the case of alcohol, users of tobacco products ... made a consumer choice in the face of health risks that [have been] common to ordinary knowledge [since well before 1966].").

Moreover, by 1962, when the Surgeon General's advisory committee began examining the health risks associated with smoking, there were already more than seven thousand publications of professional and general circulation examining the relationship be-

---

4. *See Castano v. American Tobacco Co.,* 870 F.Supp. 1425, 1433 (E.D.La.1994)(noting that in hearing before Congress on April 14, 1994, the chief executive officers of the major tobacco manufacturers testified that nicotine is not addictive, and that Phillip Morris purchased full-page newspaper ads following that testimony, which read in part: "Phillip Morris does not believe cigarette smoking is addictive"); *but see Tobacco Executives Still Claim Smoking not Killer, Paper Says,* Hous. Chron., April 21, 1997, at 3 ("On March 20, Liggett, maker of L & Ms and Chesterfields, settled 22 state lawsuits by agreeing to label its cigarettes addictive and admitting ciga-

rettes are targeted to teen-agers and cause cancer.").

5. The following colloquy occurring between the Court and American's counsel at the oral argument of this case:

COURT: Does your client agree or disagree that cigarette smoking is dangerous to one's health.

COUNSEL: Our client agrees that there is a risk factor in smoking cigarettes.

COURT: Rendering it dangerous to one's health?

COUNSEL: There is a risk factor from a statistical standpoint. We do not agree that smoking causes lung cancer because we don't know.

tween smoking and health. PUBLIC HEALTH SERVICE, U.S. DEP'T OF HEALTH AND HUMAN SERVS., PUB. No. 89–8411, REDUCING THE HEALTH CONSEQUENCES OF SMOKING: 25 YEARS OF PROGRESS: A REPORT OF THE SURGEON GENERAL 2 (1989). Of these publications, articles published in nationally circulated magazines dating back to the early 1900s informed readers about the deleterious effects of smoking. Brown, *Is a Tobacco Crusade Coming?*, ATLANTIC MONTHLY, Oct. 1920, at 447 (adverse medical science findings on smoking have been brought before the public for the past thirty years); *Does Tobacco Make One Tired?*, THE LITERARY DIGEST, Apr. 15, 1922, at 27 (noting the effect of heavy smoking, light smoking, and nonsmoking on workers' efficiency); Hirshberg, *Truth About Tobacco*, HARPER'S WEEKLY, Jan. 4, 1913 (consumer awareness of claims linking smoking to cancer, health disease, and bronchitis is pervasive); Norr, *Cancer by the Carton*, READER'S DIGEST, Dec. 1952, at 7 (examining data and projecting the number of future lung cancer deaths from smoking).

During this same period, many books examined the health risks associated with smoking and argued against the use of cigarettes. *See generally* COLES, THE BEAUTIES AND DEFORMITIES OF TOBACCO-USING (1851); GOFF, PETITION TO CONGRESS: PROHIBIT GROWING AND IMPORTATION OF TOBACCO (1913); GRISCOM, THE USE OF TOBACCO, AND THE EVILS (1868); PACK, TOBACCO AND HUMAN EFFICIENCY (1918); SCHRUMPF-PIERRON, TOBACCO AND PHYSICAL EFFICIENCY (1927); SLOCUM, ABOUT TOBACCO AND ITS DELETERIOUS EFFECTS (1909); TAYLOR, DON'T SMOKE (1944); WALSH, THE BURNING SHAME OF AMERICA: OUTLINE AGAINST NICOTINE (1924). These books and articles published before 1952 indicate that the general dangers of smoking were common knowledge even before Grinnell began smoking. *See, e.g.*, Crist & Majoras, *The "New" Wave in Smoking and Health Litigation—Is Anything Really So New?*, 54 TENN. L. REV. 551, 553 (1987) ("Even prior to the beginning of this century, ... the public [was] constantly exposed to innumerable reports associating smoking with health risks."); Henderson & Twerski, *Closing the American Products Liability Frontier: The Rejection of Liability Without Defect*, 66

N.Y.U. L. REV. 1263, 1325 (1991) ("The amount of information available to American consumers about the dangers of smoking is, and for some while has been, staggering.").

Not only does historical evidence illustrate the public's pre-1952 awareness of smoking's dangerous effects, but the Grinnells' experts also confirmed that the health hazards of smoking were common knowledge when Grinnell began smoking. Dr. Ravenholt, an expert on cancer and its causes, testified that the dangers of smoking were well known by the 1950s: "I think the majority [of people] would have been aware, you know, an adult, reasonably intelligent." He also testified that, in 1950, "evidence emerged of the lung cancer producing capability of smoking" and that the dangers attributable to smoking were extensively published and frequently front-page news stories in the 1950s. Dr. Greenberg likewise testified that the decision to smoke or refrain from smoking cigarettes is a matter of "individual personal responsibility" in light of the health risks.

■ We conclude that the general health dangers attributable to cigarettes were commonly known as a matter of law by the community when Grinnell began smoking. *See Caterpillar, Inc. v. Shears*, 911 S.W.2d at 383 (common knowledge is usually determined as a matter of law). We cannot conclude, however, that the specific danger of nicotine addiction was common knowledge when Grinnell began smoking. Addiction is a danger apart from the direct physical dangers of smoking because the addictive nature of cigarettes multiplies the likelihood of and contributes to the smoker's ultimate injury, in Grinnell's case, lung cancer. *See* Garner, *Cigarette Dependency and Civil Liability: A Modest Proposal*, 53 S. Cal. L.Rev. 1423, 1430 (1980) ("[D]ependency adds a new dimension to smoking, for it greatly increases the likelihood of high volume, long term use which leads to disease, disability, and early death."). This Court has also recognized the seriousness of addiction and the need for manufacturers to warn of this danger in the context of prescription drugs. *Crocker v. Winthrop Labs.*, 514 S.W.2d 429, 432–33 (Tex.1974) (holding drug manufacturer liable under *Restatement (Second) of Torts* § 402B

for misrepresenting that drug "was free and safe from all dangers of addiction"); *see also Carlisle v. Philip Morris, Inc.*, 805 S.W.2d 498, 516 (Tex.App.—Austin 1991, writ denied) ("Indeed, the failure to warn of cigarettes' addictive nature could be the essence of a plaintiff's complaint."). We acknowledge that some authorities support the proposition that some members of the community associated addiction with smoking cigarettes earlier in this century. *Ploch v. City of St. Louis*, 345 Mo. 1069, 138 S.W.2d 1020, 1023 (1940) (cigarettes have "harmful properties" and it is common knowledge that nicotine produces "tobacco addicts"); Wiley, *The Little White Slaver*, GOOD HOUSEKEEPING, Jan. 1916, at 91 (people can become "slaves" to the cigarette habit and cigarette smoking can "shorten their lives").

The Surgeon General spoke to the addictive nature of tobacco in the most recent and comprehensive report on the subject in 1988. PUBLIC HEALTH SERVICE, U.S. DEP'T OF HEALTH AND HUMAN SERVS., PUB. NO. 8406, THE HEALTH CONSEQUENCES OF SMOKING: NICOTINE ADDICTION: A REPORT OF THE SURGEON GENERAL (1988) (hereafter NICOTINE ADDICTION). In that report, the Surgeon General concluded that: (1) cigarettes and other forms of tobacco are addicting, (2) nicotine is the drug in tobacco that causes addiction, and (3) the pharmacologic and behavioral processes that determine tobacco addiction are similar to those that determine addiction to drugs such as heroin and cocaine. *Id.* at iii.[6] More recently, the Food and Drug Administration has concluded that tobacco products are addictive. *Regulations Restricting the Sale and Distribution of Cigarettes and Smokeless Tobacco to Protect Children and Adolescents*, 61 FED. REG. 44396, 44555–56 (1996) (to be codified at 21 C.F.R. pts. 801, 803, 804, 807, 820, and 897) ("[T]he evidence

shows that cigarettes and smokeless tobacco are highly addictive, cause other psychoactive effects ... and that these effects are widely accepted in the scientific community."); see *Coyne Beahm, Inc. v. United States Food and Drug Admin.*, 958 F.Supp. 1060 (M.D.N.C.1997) (upholding FDA's jurisdiction to impose access restrictions and labeling requirements on tobacco products).

But we cannot simply assume that common knowledge of the general health risks of tobacco use naturally includes common knowledge of tobacco's addictive quality. Indeed, as David Kessler, former head of the FDA, has pointed out:

> Before 1980, when FDA last considered its jurisdiction over tobacco products, *no* major public health organization had determined that nicotine was an addictive drug. Today, however, *all* major public health organizations in the United States and abroad with expertise in tobacco or drug addiction recognize that the nicotine delivered by cigarettes and smokeless tobacco is addictive.

Kessler et al., *The Legal and Scientific Basis for FDA's Assertion of Jurisdiction over Cigarettes and Smokeless Tobacco*, 277 JAMA 405, 406 (1997) (emphasis added). The FDA based its 1996 assertion of jurisdiction on "a wealth of epidemiologic and laboratory data establishing that tobacco users display the clinical symptoms of addiction and that nicotine has the characteristics of other addictive drugs." *Id.* Thus, unlike the general dangers associated with smoking, as late as 1988 and certainly in 1952, the danger of addiction from smoking cigarettes was not widely known and recognized in the community in general, or, particularly, by children or adolescents. NICOTINE ADDICTION at vi. The FDA has explained that because of tobacco's

---

**6.** In 1964, the Surgeon General's advisory committee defined chronic tobacco use as a habit rather than an addiction. *See* PUBLIC HEALTH SERVICE, U.S. DEP'T OF HEALTH, EDUCATION, & WELFARE, PUB. NO. 1103, SMOKING AND HEALTH: REPORT OF THE ADVISORY COMMITTEE TO THE SURGEON GENERAL OF THE PUBLIC HEALTH SERVICE 354 (1964). A drug is generally considered addictive if: (1) it is psychoactive (has intrinsic effects on mood or performance), (2) it is reinforcing (initiates searching behavior that is determined by a need for the substance), and (3) it triggers compulsive use and

concomitant withdrawal symptoms when not used. *See* Scharf, *Breathe Deeply: The Tort of Smokers' Battery*, 32 HOUS. L. REV. 615, 636 n. 78 (1995); PUBLIC HEALTH SERV., U.S. DEP'T OF HEALTH & HUMAN SERVS., PUB. NO. 89–8411, REDUCING THE HEALTH CONSEQUENCES OF SMOKING: 25 YEARS OF PROGRESS. A REPORT OF THE SURGEON GENERAL 341 (1989). As noted above, "[s]cientists in the field of drug addiction now agree that nicotine, the principal pharmacologic agent that is common to all forms of tobacco, is a powerfully addicting drug." NICOTINE ADDICTION at i.

addictive effects, the only way to prevent the ensuing disease and death is to prevent children and adolescents from starting to use tobacco: "Most people who suffer the adverse health consequences of using cigarettes and smokeless tobacco begin their use before they reach the age of 18, an age when they are not prepared for, or equipped to, make a decision that, for many, will have lifelong consequences." *Regulations,* 61 FED. REG. at 44398.

Because the community's knowledge concerning the danger of nicotine addiction associated with cigarettes was not beyond dispute in 1952, the *Seagram* standard for finding common knowledge as a matter of law has not been met. We agree with the court in *Rogers v. R.J. Reynolds Tobacco Co.:*

> There is no basis for our judicially noticing what the ordinary consumer's knowledge concerning the addictive qualities of cigarettes may have been when [the plaintiff] began smoking in 1940. The state of knowledge attributable to the community of individuals consuming cigarettes has changed over time and will continue to do so. It was not until 1988 that the Surgeon General published a report informing of the addictive nature of cigarettes.

557 N.E.2d 1045, 1054 (Ind.Ct.App.1990).[7] Accordingly, we hold that American did not establish as a matter of law that the danger of addiction associated with cigarettes was commonly known in 1952.

Because we conclude that American did not conclusively establish that the danger of addiction to nicotine was common knowledge, the Grinnells may maintain their strict liability marketing defect claims to the extent they are based on the addictive qualities of cigarettes, if no other defenses defeat those claims.

■ The Grinnells assert that American breached its duty to warn users about it product's addictive nature because before January 1, 1966, the product's packages contained no warnings. A manufacturer is required to give an adequate warning if it knows or should know that potential harm may result from use of the product. *Bristol–Myers Co. v. Gonzales,* 561 S.W.2d 801, 804 (Tex.1978). In the absence of a warning, a *rebuttable* presumption arises that the "user would have read and heeded such warnings and instructions." *Magro v. Ragsdale Bros., Inc.,* 721 S.W.2d 832, 834 (Tex.1986) (citing *Technical Chem. Co. v. Jacobs,* 480 S.W.2d 602, 606 (Tex.1972)). A manufacturer may rebut the presumption with evidence that the plaintiff did not heed whatever warnings were given, or would not have heeded any proposed warnings. *See Magro,* 721 S.W.2d at 834; *see also General Motors Corp. v. Saenz,* 873 S.W.2d 353, 358–59 (Tex.1993).

The Grinnells assert that when Grinnell started smoking in 1952 he did not know and had heard nothing about any risk of addiction associated with smoking. The Grinnells further assert that American's failure to warn of the addictive nature of cigarettes caused Grinnell's eventual death because Grinnell testified that had he known what he later learned, he would never have started smoking. In rebuttal, American cites testimony that in the late 1950s and the 1960s, Grinnell continued smoking despite warnings from his father, coaches, and friends.

■ At most, the evidence relied on by American establishes that some people warned Grinnell about the general dangers of smoking. It does not conclusively establish that had Grinnell been warned that cigarettes were addictive *before* he began smoking he would have refused to follow the warnings. Grinnell testified at his deposition that if he had known of the dangers associated

---

**7.** Thus, regarding comment i, the *Rogers* court noted:

> The reference in comment i to tobacco ... does not as a matter of law remove all claims of defective tobacco products from the operation of § 402A....[Footnote 8]
>> [Footnote 8:] Failing to warn the consumer of certain properties, such as nicotine addiction, in conjunction with its harmful qualities, render the product unreasonably

> dangerous.... Also, a design defect which renders the product more addictive than it could be or addictive when it need not be at all may render the cigarette unreasonably dangerous in conjunction with its harmful qualities.

557 N.E.2d at 1053 & n. 8; *see Burton v. R.J. Reynolds Tobacco Co.,* 884 F.Supp. 1515, 1525–26 (D.Kan.1995).

with smoking, including addiction, he never would have *started* smoking. At the very least, this testimony creates a fact issue regarding whether Grinnell would have heeded warnings had they been given to him before he began smoking. Dr. Grabowski, an expert on addiction, testified that Grinnell was addicted to cigarettes by the late 1950s and early 1960s and could not have stopped smoking without "intensive intervention." In short, American's summary judgment evidence does not conclusively establish that adequate warnings would not have been followed and thus would not have "made a difference in the outcome." *Saenz*, 873 S.W.2d at 357. Summary judgment on the Grinnells' marketing defect theory related to the addictive nature of cigarettes was therefore improper.

Thus, to the extent we hold that the general health risks of smoking were within the knowledge common to the community even before Grinnell began smoking in 1952, American has established that its cigarettes were not unreasonably dangerous. Summary judgment was, therefore, proper to the extent the Grinnells' strict liability claims relate to the general health risks associated with smoking. However, we also hold that American did not establish as a matter of law that the specific danger of addiction from smoking was knowledge common to the community. Therefore, we hold that the Grinnells' marketing defect claim survives to the extent it is based on the allegation that the addictive nature of cigarettes rendered American's products unreasonably dangerous, and to the extent it is not preempted by federal law.[8]

### 2. Design Defect

■■■ The duty to design a safe product is "an obligation imposed by law." *McKisson v. Sales Affiliates, Inc.*, 416 S.W.2d 787, 789 (Tex.1967). Whether a seller has breached this duty, that is, whether a product is unreasonably dangerous, is a question of fact for the jury. *See Turner v. General Motors Corp.*, 584 S.W.2d 844, 848 (Tex. 1979). In determining whether a product is defectively designed, the jury must conclude

that the product is unreasonably dangerous as designed, taking into consideration the utility of the product and the risk involved in its use. *Id.* at 847 n. 1.

In *Turner* we held that evidence of the following factors of risk and utility were admissible in design defect cases: (1) the utility of the product to the user and to the public as a whole weighed against the gravity and likelihood of injury from its use; (2) the availability of a substitute product which would meet the same need and not be unsafe or unreasonably expensive; (3) the manufacturer's ability to eliminate the unsafe character of the product without seriously impairing its usefulness or significantly increasing its costs; (4) the user's anticipated awareness of the dangers inherent in the product and their avoidability because of general public knowledge of the obvious condition of the product, or of the existence of suitable warnings or instructions; and (5) the expectations of the ordinary consumer. *Id.* at 846, 847. *See also Caterpillar, Inc.*, 911 S.W.2d at 384; *Boatland of Houston, Inc. v. Bailey*, 609 S.W.2d 743, 746 n. 2 (Tex.1980).

■■■ American argues that the common-knowledge defense bars the Grinnells' design defect claims as a matter of law. But, as we stated in *Turner*, "the user's anticipated awareness of the dangers inherent in the product and their avoidability because of general public knowledge of the obvious condition of the product," and "the expectations of the ordinary consumer," are but two factors for the jury to consider when determining whether a product was defectively designed. American's attempt to invoke the common-knowledge defense is actually an attempt to invoke the "open and obvious defense" or "patent danger rule," which this Court has rejected in design defect cases:

A number of courts are of the view that obvious risks are not design defects which must be remedied. *See, e.g., Gray*, 771 F.2d at 870 (applying Mississippi law); *Delvaux v. Ford Motor Co.*, 764 F.2d 469, 474 (7th Cir.1985) (applying Wisconsin law); *Young v. Tide Craft, Inc.*, 270 S.C. 453, 242 S.E.2d 671, 680 (1978). However,

---

**8.** *See* Part II, Federal Preemption Defense, *infra.*

our Court has held that liability for a design defect may attach even if the defect is apparent. *Turner*, 584 S.W.2d at 850. Determining if a design is unreasonably dangerous requires balancing the utility of the product against the risks involved in its use. *Id.* at 847 & n. 1

*Caterpillar, Inc.*, 911 S.W.2d at 383–84. Accordingly, American's attempt to invoke the common-knowledge defense in the context of an alleged design defect is without merit.

Alternatively, American argues that it is entitled to summary judgment because no safer alternative cigarette design exists. In *Turner*, we held that "the availability of a substitute product which would meet the same need and not be unsafe or unreasonably expensive," was one factor for juries to consider when determining whether a product was defectively designed. We reaffirmed this holding in *Caterpillar, Inc. v. Shears* by stating that "if there are no safer alternatives, a product is not unreasonably dangerous as a matter of law." 911 S.W.2d at 384.[9] Accordingly, if there is no safer alternative to the cigarette manufactured by American, then its cigarettes are not unreasonably dangerous as a matter of law.

The Grinnells assert that American's cigarettes could have been made reasonably safer by filtration, and by reducing the amount of tobacco, tar, nicotine, and toxins in them. In making its argument that no reasonably safer alternative design exists, American relies on the testimony of the Grinnells' experts, Drs. Greenberg, Stevens, and Ginzel. These experts testified that Grinnell would have developed cancer and died regardless of whether filters, lower tar, or less tobacco had been used. Specifically, Dr. Greenberg testified:

Q: It didn't matter to you and your opinion would not have changed as to the cause of the lung cancer, regardless of the brand, whether it was filtered or nonfiltered, short or long cigarette. Is that right?

A: That's correct.

Dr. Ginzel testified similarly:

Q: Doctor, is there any safe cigarette with respect to lung cancer?

A: Not that I know of.

Q: Is there any design for a cigarette that Mr. Grinnell could have smoked that would have avoided his claimed lung cancer?

A: Not during his lifetime, no.

 Ultimately, the Grinnells essentially concede that no reasonably safer alternatives exist, but argue that all cigarettes are defective and unreasonably dangerous nonetheless.[10] Because American conclusively proved that no reasonably safer alternative design exists for its cigarettes, we hold that summary judgment was proper on all of the Grinnells' design defect claims, including those based on the addictive quality of cigarettes.

### 3. Manufacturing Defect

We turn next to the Grinnells' strict liability claim based on a manufacturing defect. The Grinnells assert that American's products were defectively manufactured because they contained carcinogens and other toxic chemicals, including pesticide residue. During discovery, the Grinnells obtained internal documents showing that American fumigated its Turkish tobacco with Acritet 34, a chemical composed of acrylonitrile and carbon tetrachloride. American uses Turkish tobacco in all of its cigarettes. In 1978, American circulated a memorandum noting new gov-

---

9. Although not applicable to the present case, the Texas Legislature has codified the "safer alternative" requirement. Tex. Civ. Prac. & Rem.Code § 82.005 (safer alternative design must be shown by preponderance of the evidence in design defect case).

10. By arguing for liability even in the absence of a reasonably safer alternative design, the Grinnells effectively propose that we adopt a system of categorical liability with respect to cigarettes. Categorical liability is not only an unworkable solution, but also a position repeatedly rejected by courts. *See generally* Grossman, *Categorical Liability: Why the Gates Should be Kept Closed*, 36 S. Tex. L. Rev. 385, 392 (1995)(noting that categorical liability has been advocated, unsuccessfully, for alcoholic beverages, handguns and cigarettes); Henderson & Twerski, *Closing the American Products Liability Frontier: The Rejection of Liability Without Defect*, 66 N.Y.U. L. Rev. 1263, 1307 (1991)(courts should not abandon traditional risk/utility test in favor of categorical exclusion).

ernment regulations requiring all materials containing acrylonitrile to be affixed with a "Cancer Hazard" warning label. Likewise, the Grinnells allege that American knew that methyl bromide pesticide residue remained in its tobacco after fumigation. The Grinnells alleged that this potentially cancerous pesticide residue contributed to Grinnell's cancer and resulting death.

■■■■ Under Texas law, a plaintiff has a manufacturing defect claim when a finished product deviates, in terms of its construction or quality, from the specifications or planned output in a manner that renders it unreasonably dangerous. *See Ford Motor Co. v. Pool,* 688 S.W.2d 879, 881 (Tex.App.—Texarkana 1985), *aff'd in part and rev'd in part on other grounds,* 715 S.W.2d 629 (Tex.1986); *see also Lucas v. Texas Indus., Inc.,* 696 S.W.2d 372, 377–78 (Tex.1984); *Morgan v. Compugraphic Corp.,* 675 S.W.2d 729, 732–33 (Tex.1984); *Darryl v. Ford Motor Co.,* 440 S.W.2d 630, 632 (Tex.1969). The common-knowledge defense does not apply to this type of claim because a user does not anticipate a manufacturing defect. This type of defect is a deviation from the planned output. *See Pool,* 688 S.W.2d at 881; *see also* TEX. CIV. PRAC. & REM.CODE § 82.004(b).

American, conceding that its cigarettes contain pesticide residue, argues that summary judgment was proper because all cigarette manufacturers fumigate their tobacco with some type of pesticide, and residue inevitably remains after fumigation. Thus, American concludes that the Grinnells' claims based on the presence of pesticide residue are actually design defect claims masquerading as manufacturing defect claims.

■■■ According to the undisputed facts, pesticide residue is incidentally, yet normally, found in tobacco after it is fumigated. The presence of pesticide residue is not an anomaly attributable only to the cigarettes Grinnell smoked. Nevertheless, the fact that all cigarettes potentially contain pesticide residue does not transform the Grinnells' manufacturing defect claim into a design defect claim subject to the common-knowledge defense. Simply because certain precautions or improvements in manufacturing technology, which could eliminate pesticide residue

from cigarettes, are universally disregarded by an entire industry does not excuse their omission. *See T.J. Hooper,* 60 F.2d 737, 740 (2d Cir.), *cert. denied,* 287 U.S. 662, 53 S.Ct. 220, 77 L.Ed. 571 (1932). Although pesticide residue may be found in many if not all cigarettes, it is not an ingredient American intended to incorporate into its cigarettes. Analyzed in this light, the presence of pesticide residue could be a manufacturing defect, not a design defect. Therefore, American did not conclusively negate the existence of a defect in its cigarettes.

■■■ Alternatively, American contends that any alleged manufacturing defect rendering its product unreasonably dangerous did not cause Grinnell's injuries. A plaintiff must establish "a causal connection between [the defective] condition and the plaintiff's injuries or damages." *Lucas,* 696 S.W.2d at 377 (quoting *Armstrong Rubber Co. v. Urquidez,* 570 S.W.2d 374, 376 (Tex.1978)); *see Morgan,* 675 S.W.2d at 732–33. In support of this point, American argues that the Grinnells presented no evidence of causation on their manufacturing defect claim. American correctly asserts that none of the Grinnells' experts testified that the presence of pesticide residue caused or contributed to Grinnell's development of lung cancer. The Grinnells' experts testified that: (1) they were unaware of any pesticide residue in American's cigarettes; (2) their opinions that Grinnell developed lung cancer from smoking cigarettes were based on generic smoking studies that did not isolate individual brands of cigarettes and their individual effects; and (3) their opinions would be the same regardless of whether pesticide residue was present in American's cigarettes.

American mistakes its summary judgment burden. On summary judgment it is not incumbent upon a plaintiff nonmovant to produce evidence supporting the allegations made in her pleadings; rather, the defendant movant must conclusively negate at least one element of the plaintiff's cause of action. *Boys Clubs of Greater Dallas,* 907 S.W.2d at 476. Here, without proving that pesticide residue in cigarettes does not cause cancer in humans, American attempts to meet its bur-

den by focusing on what the Grinnells failed to prove. This does not conclusively negate the element of causation. The Grinnells' experts' testimony merely illustrates that the experts' conclusions that smoking caused Grinnell's cancer were not dependent on the presence of pesticide residue, not that pesticide residue could not have contributed to or caused Grinnell's cancer. We hold that summary judgment was improper on the manufacturing defect claim.

### B. Implied Warranty

■ Next, we consider the Grinnells' implied warranty claims. We hold that the common-knowledge defense applies and bars these claims to the extent they relate to the general health risks of cigarettes. The Grinnells' implied warranty claims stem from the allegation that American impliedly warranted that its cigarettes were merchantable and fit for their intended purpose. *See* TEX. BUS. & COM.CODE § 2.314. The Grinnells allege that American's cigarettes are neither merchantable nor fit for their intended purpose because they are not safe for human consumption, cause injury to the user, and are addictive. An implied warranty is a representation about the implied quality or suitability of a product that the law implies and imports into a contract, "in view of all facts and circumstances attending the transaction, including the nature of the property, terms of the agreement, and trade usages." *Donelson v. Fairmont Foods Co.*, 252 S.W.2d 796, 799 (Tex.Civ.App.—Waco 1952, writ ref'd n.r.e.). Knowledge common to the community about a certain product is also a factor that must be considered when deciding whether an implied warranty exists. *See Allgood*, 80 F.3d at 172.

■ An implied warranty contrary to the community's common knowledge cannot exist. *Cf.* TEX. BUS. & COM.CODE § 2.313 cmt. 1. Because the general health dangers of cigarettes are commonly known by the community, no expectation of safety arises with respect to cigarettes when they are purchased. As American established the common-knowledge defense for the general health risks associated with cigarettes as ·a matter of law, it also conclusively negated the claims asserting that it impliedly warranted

that its cigarettes were safe for consumption. To the extent this claim relates to the general health risks of cigarettes, summary judgment was proper. However, as we explained above, American did not conclusively establish that the danger of nicotine addiction was common knowledge in 1952. The common-knowledge defense does not preclude the Grinnells' implied warranty claims to the extent they relate to the addictive quality of cigarettes.

■ American further alleges that all of the Grinnells' remaining implied warranty claims are barred by limitations. Section 2.725(b) of the Texas Business and Commerce Code provides a four-year limitations period for all warranty claims. TEX. BUS. & COM.CODE § 2.725(b). Regarding the time of accrual, "[i]mplied warranties relate to the condition, kind, characteristics, suitability, etc. of sold goods at the time of sale; thus, the statute of limitations on implied warranties runs from the date of the sale." *Safeway Stores, Inc. v. Certainteed Corp.*, 710 S.W.2d 544, 546 (Tex.1986). The four-year statute of limitations on implied warranties began to run at the time of delivery, not when Grinnell discovered he had cancer. Accordingly, the implied warranty claims predicated upon the addictive nature of cigarettes and that arose within four years before Grinnell filed suit are not barred by limitations and may be maintained. Accordingly, we remand these surviving implied warranty claims.

### C. Fraud, Fraudulent Concealment, Negligent Misrepresentation, and Express Warranty

We turn next to the Grinnells' claims for fraudulent misrepresentation, fraudulent concealment, negligent misrepresentation, and express warranty. These claims are based on alleged misrepresentations in American's advertisements. The Grinnells allege that if American had revealed the health risks of smoking cigarettes, and had not deceived Grinnell by making false representations to the contrary, Grinnell never would have started smoking.

The documents the Grinnells claim contained misrepresentations include (1) a 1953

press release by Paul Hahn, then American's president, (2) a promotional item entitled "*A Frank Statement to Cigarette Smokers*" released by the Tobacco Industry Research Committee, of which American was a member, and (3) an advertisement entitled "*Why We're Dropping The New York Times.*" All three of these documents stated that American and the tobacco industry still believed that smoking was not injurious to health and that no one had yet proved that lung cancer in any human being was directly traceable to smoking tobacco. These materials also implied that cigarettes were safe, fit for human consumption, free of contaminants, and not addictive. A fourth document the Grinnells allege contained affirmative misrepresentations is an advertisement stating that the longer Pall Mall cigarette naturally "filters the smoke" but "does not filter out the Pall Mall flavor." This advertisement also stated that Pall Malls were friendly to a smoker's taste and that "for flavor and mildness fine tobacco filters best."

The Grinnells also contend that American intended consumers of its products to see and rely on the statements in its advertisements. They bolster this contention with the deposition testimony of Robert Heimann, one of American's former chief executive officers, who testified: "There is no reason why [consumers] could not accept our position stated here and elsewhere that the products we make are not injurious to health." Similarly, Preston Leake, American's research and development officer, testified in his deposition that "these are safe products."

■ At the outset, we recognize that the fraud, fraudulent concealment, negligent misrepresentation, and express warranty claims all share the common element of reliance. In Texas, a plaintiff establishes actionable fraud if the defendant makes a material representation, that is false, either known to be false when made or is asserted without knowledge of its truth, that is intended to be and is relied upon, and that causes injury. *Sears, Roebuck & Co. v. Meadows*, 877 S.W.2d 281, 282 (Tex.1994); *T.O. Stanley Boot Co. v. Bank of El Paso*, 847 S.W.2d 218,

222 (Tex.1992). Similarly, when circumstances impose upon a party a duty to speak and the party remains silent, the silence itself can be a false representation. *Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 435 (Tex.1986); *Smith v. National Resort Communities, Inc.*, 585 S.W.2d 655, 658 (Tex. 1979). Just as with affirmative misrepresentations, the allegedly defrauded party must have reasonably relied on the silence to his detriment. *See Allgood*, 80 F.3d at 171; *Spoljaric*, 708 S.W.2d at 435. Likewise, negligent misrepresentation claims require reasonable reliance on the representation. *See Federal Land Bank Ass'n v. Sloane*, 825 S.W.2d 439, 442 (Tex.1991).

Though not a fraud-based claim, an express warranty claim also requires a form of reliance. The Uniform Commercial Code provides that an express warranty is created when "[a]ny affirmation of fact or promise [is] made by the seller to the buyer which relates to the goods and becomes part of the *basis of the bargain.*" TEX. BUS. & COM.CODE § 2.313(a)(1) (emphasis added). "Basis of the bargain" loosely reflects the common-law express warranty requirement [11] of reliance. *Southwestern Bell Tel. Co. v. FDP Corp.*, 811 S.W.2d 572, 575 & n. 2 (Tex.1991); *see Morris v. Adolph Coors Co.*, 735 S.W.2d 578, 587 (Tex.App.—Fort Worth 1987, writ ref'd n.r.e.).

■ Because all four of the representational claims asserted by the Grinnells require some form of reliance, summary judgment was proper on each if American negated reliance as a matter of law. We hold that American conclusively negated the element of reliance.

The summary judgment record establishes a complete absence of reliance. Grinnell testified in his deposition that he specifically remembered seeing only R.J. Reynolds's advertisements, but that he might have also seen American's advertisements. The first time he remembered seeing any advertisements disputing the alleged link between smoking and lung cancer was in "the early '80's and maybe late '70's," approximately

---

11. *See Shamrock Fuel & Oil Sales Co. v. Tunks*, 416 S.W.2d 779, 786 (Tex.1967)(common law requires reliance on a representation before an express warranty arises).

thirty years after he began smoking. These advertisements from the 1970s and 1980s have not been produced, were not reviewed by Grinnell during his deposition, and were not included in the record. The materials on which the Grinnells actually base their claims, however, were all released in the 1950s and 1960s. Grinnell never testified that he relied on these advertisements and his own deposition testimony establishes that he began smoking because his friends smoked, and that he later changed brands from Lucky Strikes to Pall Malls to Pall Mall Golds based on taste, not because of advertisements.

Of the various advertisements Grinnell remembered seeing and claimed to have relied on, only advertisements for Old Golds and Camels directly equated smoking with health. The Old Golds advertisements stated, "For a Treat Instead of a Treatment ... Smoke Old Golds." The Camel advertisements stated "More Doctors Smoke Camels Than Any Other Cigarette!" Grinnell never smoked Camels or Old Golds and American never manufactured these brands of cigarettes. Reliance on these advertisements does not raise a fact issue in this case. Moreover, the parties do not dispute that neither Robert Heimann's nor Preston Leake's statements concerning American's intent or the safety of its products were included in advertisements or other materials disseminated to the public.

In short, American's summary judgment evidence proves that Grinnell did not rely on any of American's advertisements from the 1950s and 1960s, and that, although he could have conceivably relied on the advertisements from the 1970s and 1980s, these advertisements were not included in the record and their content is subject to speculation. Speculation cannot create a fact issue. *Duff v. Yelin*, 751 S.W.2d 175, 176 (Tex.1988). Based on this record, we hold that American conclusively negated the element of reliance. Summary judgment was proper on the fraud, fraudulent concealment, negligent misrepresentation, and express warranty claims.

## D. Negligence

■■■■■ We next consider the Grinnells' claims for negligent design, manufacture, testing, and failure to warn. The Grinnells' negligent design and manufacturing claims are conceptually distinguishable from the strict liability claims. While strict liability focuses on the condition of the product, "[n]egligence looks at the acts of the manufacturer and determines if it exercised ordinary care in design and production." *Caterpillar, Inc.*, 911 S.W.2d at 384. Negligent design and manufacturing claims are predicated on the existence of a safer alternative design for the product. *Id.* at 384–85; *Gonzales v. Caterpillar Tractor Co.*, 571 S.W.2d 867, 871–72 (Tex.1978). Absent an alternative design, a claim for negligent design or manufacturing fails as a matter of law. As we previously discussed, American conclusively proved that no reasonably safer alternative design exists for its cigarettes. Accordingly, the Grinnells cannot maintain their claims for negligent manufacturing and design as a matter of law.

■■■■■ Additionally, as we held above, American conclusively established the common-knowledge defense with regard to the general health risks associated with smoking. Therefore, summary judgment was proper on the Grinnells' negligent failure to warn claim to the extent it relates to the general health risks of smoking. The Grinnells' negligent testing claim is predicated on American's duty to test and ascertain the dangers inherent in its products about which it must warn consumers. Because the negligent testing claim is inextricably intertwined with the Grinnells' negligent failure to warn claim, we hold that summary judgment was also proper on this claim to the extent it relates to the general health risks of cigarettes. However, American did not conclusively establish that the specific danger of addiction was knowledge common to the community in 1952. Accordingly, the common-knowledge defense does not preclude the Grinnells' pre–1969 negligent failure to warn and negligent testing claims to the extent these claims relate to the addictive qualities of cigarettes and are not preempted by federal law.

## E. Conspiracy

■■■■■ The Grinnells contend that American, other cigarette manufacturers,

and tobacco trade groups conspired to counter and suppress evidence about the alleged harmful effects of cigarettes. Allegations of conspiracy are not actionable absent an underlying overt unlawful act or purpose. *Firestone Steel Prods. Co. v. Barajas*, 927 S.W.2d 608, 614 (Tex.1996); *Massey v. Armco Steel Co.*, 652 S.W.2d 932, 934 (Tex.1983). In light of our conclusion that the trial court properly granted summary judgment on all of the Grinnells' other claims related to fraud or concealment, summary judgment on the conspiracy claim was proper.

## F. Restatement Claims

The Grinnells allege that American violated sections 321, 389, 519, and 520 of the *Restatement (Second) of Torts* by (1) failing to take remedial measures to prevent harm caused by its products after the cigarettes were placed in the stream of commerce, (2) wrongfully assuming that consumers would heed adequate warnings on cigarette packages, and (3) engaging in an ultra hazardous activity by designing, manufacturing, and selling cigarettes that were inherently dangerous. We hold that summary judgment was proper on these claims.

■■■■ This Court has not recognized claims based on *Restatement* sections 321 (duty to act to prevent risk once prior conduct is found to be dangerous) or 389 (liability for supplying a known dangerous product if injury results even if a warning has been given). These sections are particularly ill-suited for application to what are essentially products liability claims because they impose liability even when the manufacturer provides adequate warnings. *See Maguire v. Pabst Brewing Co.*, 387 N.W.2d 565, 568–72 (Iowa 1986). Moreover, whether a product is dangerous is determined when it leaves the manufacturer's hands and enters the stream of commerce; subsequent acts have no bearing on the issue. *Turner v. General Motors Corp.*, 584 S.W.2d 844, 848 (Tex.1979).

■■■■ The Grinnells also assert claims based on sections 519 and 520 of the *Restatement* and allege that American should be liable for "[carrying] on an abnormally dangerous activity." Although several courts of appeals have discussed sections 519 and 520,

no court has recognized these sections as creating viable claims in Texas. *See Ellsworth v. Bishop Jewelry & Loan Co.*, 742 S.W.2d 533, 535–36 (Tex.App.—Dallas 1987, writ denied); *Robertson v. Grogan Inv. Co.*, 710 S.W.2d 678, 679 (Tex.App.—Dallas 1986, no writ). Moreover, claims for products liability and actions implicating consumer marketing are not within the logical purview of the abnormally dangerous activity standard. *See Perkins v. F.I.E. Corp.*, 762 F.2d 1250, 1265 & n. 43 (5th Cir.1985); *Maguire*, 387 N.W.2d at 568–69; RESTATEMENT (SECOND) TORTS § 519 cmt. d. We decline to adopt sections 321, 389, 519, and 520 of the *Restatement* in this case. Accordingly, summary judgment on these claims was proper.

## II. Federal Preemption Defense

We turn finally to the claims American alleges are preempted by federal law. In 1965, Congress enacted the Federal Cigarette Labeling and Advertising Act, Pub.L. No. 89–92, 79 Stat. 282, and in 1969, it amended the 1965 Act by enacting the Public Health Cigarette Smoking Act, Pub.L. No. 91–222, 84 Stat. 87. Both Acts, codified at 15 U.S.C. §§ 1331–1340, specify the warnings a cigarette manufacturer must place on its packages and advertisements. Both Acts also effectively prevent the states from regulating the design, manufacture, marketing, and sale of cigarettes.

The United States Supreme Court considered the preemptive effect of the Acts in *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992). In that case, the Supreme Court held that the Federal Cigarette Labeling and Advertising Act of 1965 precludes the states only from imposing their own labeling requirements on cigarette manufacturers, *Cipollone*, 505 U.S. at 518–20, 112 S.Ct. at 2618–19, but that the Public Health Cigarette Smoking Act of 1969 preempts all claims predicated on a "requirement or prohibition based on smoking and health ... imposed under State law with respect to ... advertising or promotion." *Cipollone*, 505 U.S. at 520–24, 112 S.Ct. at 2621.

Because the Public Health Cigarette Smoking Act took effect in 1969, the Act preempts claims based only on activities arising after the effective date of the Act. Claims brought after the effective date of the Act are not preempted *provided* they are based on pre–1969 activities. Specifically, in *Cipollone* the Court held that the 1969 Act preempts two types of claims. First, the 1969 Act preempts failure to warn claims based on allegations that post–1969 advertising or promotional materials should have included different warnings. *Id.* at 524–25, 112 S.Ct. at 2621–22. Second, the 1969 Act preempts claims based on misrepresentations designed to neutralize the effect of federally mandated warnings on cigarette packages. *Id.* at 527, 112 S.Ct. at 2623. This type of claim stems from state-law prohibitions on statements in advertising that tend to lessen the impact of the federal warnings and is the converse of a requirement that warnings be included in advertisements. *Id.* The 1969 Act preempts neutralization claims because these claims are inextricably related to a failure to warn theory. *Id.* at 527–28, 112 S.Ct. at 2623–24.

The Court also held that claims related to smoking and health that do not impinge on advertising or promotion are not preempted. First, negligent testing and research claims are not preempted, provided they are not related to advertising or promotion. *Id.* at 524–25, 112 S.Ct. at 2621–22. Second, breach of express warranty claims are not preempted even if the warranty is included in advertising materials because the terms of the warranty are imposed by the warrantor, not state law. *Id.* at 526–27, 112 S.Ct. at 2622–23. Third, the 1969 Act does not preempt fraudulent concealment claims based on a state-law duty to disclose material facts through channels other than advertising or promotion. *Id.* at 528, 112 S.Ct. at 2623. Fourth, misrepresentation claims based on false statements of material fact made in advertising, claims that are based on the general duty not to deceive, are not preempted. *Id.* at 528–29, 112 S.Ct. at 2623–24. Last, claims asserting conspiracy to misrepresent material facts are not preempted, provided a claim for misrepresentation can be maintained. *Id.* at 530, 112 S.Ct. at 2624–

25. As we explain below, some, but not all, of the Grinnells' claims are preempted by the 1969 Act to the extent they are based on post–1969 acts or omissions.

The first category of preempted claims are those based on the allegation that American should have provided different warnings or warnings in addition to those mandated by the 1969 Act or that it otherwise concealed the dangers of smoking. Claims based on the failure to warn allegations include strict liability failure to warn, negligent failure to warn and negligent testing, and fraudulent concealment.

■ Regarding the Grinnells' strict liability and negligent failure to warn claims, both are based upon American's failure to adequately warn of the dangers of smoking on its products' packages, in advertisements, and through other promotional materials before and after the imposition of the federal warnings. Claims based on factual allegations that American's post–1969 advertising and promotional materials "should have included additional, or more clearly stated, warnings" are preempted. *Cipollone,* 505 U.S. at 524–25, 112 S.Ct. at 2621.

■ The Grinnells' negligent testing claim is also preempted. The 1969 Act preempts negligent testing claims to the extent they are related to advertising or promotion. *Id.* In this case, the Grinnells' negligent testing claim is inextricably intertwined with advertising and promotional materials because the Grinnells allege only that American should have tested its products to determine the dangerous characteristics about which American should have warned consumers. Because the 1969 Act preempts strict liability and negligent failure to warn claims in so far as they rely on post–1969 advertising and promotional materials, American has no duty, other than its federally mandated duty, to warn of product dangers. The negligent testing claim asserted by the Grinnells necessarily depends on liability for failure to warn and is therefore preempted.

■ The fraudulent concealment claims are preempted because they too are premised on American's failure to disclose infor-

mation regarding the dangers of cigarettes. This claim is essentially a variation on the Grinnells' failure to warn claim because it is based on American's alleged duty to disclose information about the harmful effects of cigarettes. *See Forster v. R.J. Reynolds Tobacco Co.*, 437 N.W.2d 655, 662 (Minn.1989). Fraudulent concealment claims are preempted insofar as they rely on a state-law duty to disclose facts through advertising or promotion. *Cipollone*, 505 U.S. at 524–28, 112 S.Ct. at 2621–24.

With regard to the Grinnells' DTPA claims, we first note that the pre–1969 DTPA claims fail as a matter of law. The DTPA applies only to acts or practices occurring after May 21, 1973, the DTPA's effective date. TEX. BUS. & COM.CODE § 17.63; *see Litton Indus. Prods., Inc. v. Gammage*, 668 S.W.2d 319, 324 (Tex.1984). Accordingly, if all of the Grinnells' post–1969 claims are preempted, then all of their DTPA claims must also fail.

The Grinnells argue first that American violated DTPA section 17.46(b)(23) by intentionally failing to disclose information about the dangers of its cigarettes in order to induce people to smoke. As discussed above, claims for failure to disclose information through advertising or promotional materials clearly fall within the 1969 Act's preemptive scope. *Cipollone*, 505 U.S. at 524–25, 112 S.Ct. at 2621–22. Therefore, the Grinnells' DTPA "failure to disclose" claims are preempted.

Second, the Grinnells allege that American violated sections 17.46(b)(5) and (7) of the DTPA by using deceptive representations in its advertisements. Sections 17.46(b)(5) and (7) of the DTPA specifically prohibit deceptive representations in connection with the advertisement and sale of goods. TEX. BUS. & COM.CODE §§ 17.46(b)(5) & (7). The Grinnells' claim under these sections is properly characterized as a neutralization claim because American allegedly made the deceptive statements in its advertizing and promotional materials with the intent of diminishing the impact of the federal warnings. This claim is also preempted by the holding in *Cipollone* that claims based on a manufacturer's attempt to "[neutralize] the

effect of federally mandated warning labels" through advertising and promotion are preempted. *Id.* at 527–28, 112 S.Ct. at 2623. Preemption of neutralization claims is based on the rationale that a state-law prohibition of advertising that tends to minimize the health hazards associated with smoking is simply the converse of a state-law requirement that additional warnings be included in advertising and promotional materials. *Id.* Accordingly, the DTPA deceptive advertising claim is also preempted.

For the foregoing reasons, we hold that summary judgment on the Grinnells' post–1969 claims regarding warnings and the duty to avoid neutralizing the effect of the federally mandated warnings was proper as those claims are preempted by the 1969 Act.

### III. Conclusion

To summarize, the following of the Grinnells' claims survive summary judgment: pre–1969 strict liability marketing defect, pre–1969 negligent failure to warn, and pre–1969 negligent testing to the extent these claims relate to the addictive quality of cigarettes; the implied warranty claims relating to the addictive quality of cigarettes to the extent they arose within four years before the Grinnells filed suit; and the manufacturing defect claim, which survives in its entirety. Accordingly, we reverse in part and affirm in part the judgment of the court of appeals, and remand the Grinnells' surviving claims to the trial court for further proceedings.

HECHT, Justice, concurring in part and dissenting in part.

I join fully in Justice Enoch's concurring and dissenting opinion and write separately only to add a few words of my own.

Among the Court's holdings are these four things. (1) A person who started smoking in 1952 cannot recover damages for contracting lung cancer because the cigarette manufacturer did not warn that smoking may cause cancer. (2) That risk was common knowledge long before 1952.(3) But the same smoker can recover *the same damages*—that is, for contracting lung cancer—because the

cigarette manufacturer failed to warn that smoking may be addictive. (4) That risk was not common knowledge until 1988; before then it was common knowledge only that smoking was habit-forming.

For several reasons I think the Court's view is untenable.

*First:* In Texas, as in most places, the law is that "[g]ood tobacco is not unreasonably dangerous merely because the effects of smoking may be harmful; but tobacco containing something like marijuana may be unreasonably dangerous." RESTATEMENT (SECOND) OF TORTS § 402A, cmt i, at 352 (1965); *see Joseph E. Seagram & Sons, Inc. v. McGuire,* 814 S.W.2d 385, 388 (Tex.1991) (following comment i). Plaintiffs' claim in this case that the cigarettes Wiley Grinnell smoked were unreasonably dangerous because they contained pesticide residue is allowed by comment i, although I think for the reasons JUSTICE ENOCH explains, that claim cannot withstand defendant's motion for summary judgment. Plaintiffs' claim that cigarettes are addictive, however, is not allowed by comment i. Good tobacco contains nicotine. Nicotine is not a foreign or improper substance in tobacco, like marijuana (as in comment i) or pesticide (plaintiffs' allegation here) would be. If plaintiffs are right that nicotine is addictive, then addiction is merely one of the harmful effects of the tobacco itself and cannot therefore make otherwise good tobacco unreasonably dangerous. In fact, if the agents plaintiffs claim are addictive were removed from the tobacco, it would no longer be "good tobacco". One might as well smoke a maple leaf.

*Second:* The distinction between addiction and habituation, important in scientific contexts, is unimportant for purposes of comment i. The two ideas mean only one thing to smokers: it's hard to quit. This is not a new discovery, suddenly revealed by the Surgeon General in a 1988 report. Almost anyone who ever smoked for any length of time and tried to stop has found it hard; many have found it impossible. Few understood why, in terms of psychological and biochemical body processes, but the difficulty was surely no less real merely because it could not fully be explained. A product is not unreasonably dangerous unless it is "dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics." RESTATEMENT (SECOND) OF TORTS § 402A, cmt i, at 352 (1965). The ordinary smoker, and all his or her friends and family, know that it is very difficult to quit smoking. They knew it in 1988, when the Surgeon General announced that he thought smoking was addictive, *ante* at 430; they knew it in 1964, when the Surgeon General announced that he thought smoking was habitual, *ante* at 430 n. 6; and they knew it generations before Wiley Grinnell started smoking in 1952. The difficulty has long been common knowledge; labeling it "addiction", though significant scientifically, adds nothing practical to an ordinary smoker's knowledge.

*Third:* The risk of addiction is subsumed in the risk of cancer and similar health problems. Addiction is a danger at all only if the dependency is unhealthy. Addiction to smoking is dangerous, not because it is expensive or offensive to others, but because it increases the risk of lung cancer. Addiction itself is never fatal, and it can be overcome. People quit smoking. But smoking, whether because of addiction, habit, or free choice, can cause cancer that is fatal. It is an odd rule that affords recovery of damages to a plaintiff who says, "I smoked even though I knew I might get lung cancer, but I never would have done it had I known I might become addicted." Why is the risk of addiction a danger "beyond that which would be contemplated by the ordinary consumer" if the far more serious risk of cancer is common knowledge? Because, the Court says, "the addictive nature of cigarettes multiplies the likelihood of and contributes to the smoker's ultimate injury". *Ante* at 429. Granted, but allowing a smoker to sue for not being warned of the risk of addiction strikes me as allowing a person who insists on walking along the edge of a sharp cliff despite the obvious danger to sue for not being warned that he might slip. The person need never worry about slipping if he simply stayed away from the edge. What sense does it really make to say: "Don't walk on the edge

of the cliff because you could fall hundreds of feet to your death, and besides, you might slip." I simply do not see how a person who smokes despite common knowledge of the risk of cancer will be deterred by a cigarette manufacturer's warning of the risk of addiction.

*Fourth:* Even if addiction is a risk of smoking separate and apart from all the other health risks that are common knowledge and were common knowledge in 1952, and even if cigarettes are unreasonably dangerous because of that risk, a product liability claim should be limited to damages caused by *that* risk, not the risk of cancer. Yet the Court allows plaintiffs in this case to recover just as if no one had ever suspected that smoking causes cancer. If cigarettes are defective only because smoking may be addictive, plaintiffs' damages should be limited to those caused by the defect. The Court places no such limits on plaintiffs' recovery.

\* \* \* \* \*

The Court says that "no expectation of safety arises with respect to cigarettes when they are purchased". *Ante* at 435. I agree, but I do not understand why that fact is not fatal to the present litigation. Like JUSTICE ENOCH, I would affirm the district court's summary judgment on all plaintiffs' claims.

ENOCH, Justice, joined by HECHT, Justice, concurring and dissenting.

Wiley Grinnell, Jr. died of lung cancer, a risk that this Court holds as a matter of law he knowingly and willingly undertook when he began smoking American's cigarettes in 1952. Despite this conclusion, and despite the fact that Grinnell knowingly and willingly began smoking three packs a day, the Court holds that American Tobacco may be liable for Grinnell's death because some thirty-three years later Grinnell did in fact develop the disease the risk of which he freely accepted at age nineteen.

The Court hinges its decision today on the premise that while the "general health risks" of smoking were commonly known in 1952, the specific risk of addiction was not commonly known when Grinnell started smoking. However, the Court fails to explain what it means by the phrase "general health risks," giving no guidance to the parties or to the public about which cigarette-related dangers may have given rise to a duty to warn in 1952 and which did not. This shortcoming illustrates the fundamental problem with the Court's analysis—the "general health risk" of cigarettes, found by the Court to be commonly known in 1952, is that when used as intended, they can kill you. Further, in reaching its decision, the Court misreads at least two of this Court's recent opinions and misapplies the common knowledge doctrine. Finally, the Court mischaracterizes the Grinnells' pesticide claim as a manufacturing defect claim, when it is actually a design defect claim for which summary judgment for American was appropriate. I would hold that summary judgment was proper on all of the Grinnells' claims.

## I

While I agree with the Court's conclusion that the "general health risks" of cigarettes have been commonly known for some time, I disagree with several aspects of the Court's reasoning.

At the outset, the Court retreats from our unanimous opinion in *Joseph E. Seagram & Sons v. McGuire,* 814 S.W.2d 385 (Tex.1991). The Court limits *McGuire* by defining the common knowledge doctrine as an "extraordinary defense that applies only in limited circumstances." 951 S.W.2d at 427. We did not find the common knowledge doctrine so "extraordinary" in *Caterpillar, Inc. v. Shears,* 911 S.W.2d 379, 383 (Tex.1995), in which we held that a heavy equipment manufacturer did not have a duty to warn of the dangers of operating a front-end loader without a rollover protective structure. Nor did we suggest that the defense has only limited applicability. Rather, we held that the obviousness of a risk is pertinent to any inquiry about a manufacturer's or distributor's duty to warn of that risk. *Shears,* 911 S.W.2d at 382. I fail to see how the common knowledge doctrine is any more extraordinary or of more limited applicability than any other defense to liability. Accordingly, I would not restrict it as the Court does.

The Court suggests that *McGuire* is of limited applicability because it involved alcohol as the product. The Court finds *McGuire* inapposite because the distiller did not dispute the health risks of prolonged alcohol consumption. The Court's own logic falters because it acknowledges, as it must, that common knowledge does not depend on the parties' subjective knowledge or beliefs, but is an "objective determination." 951 S.W.2d at 428. Moreover, the Court ultimately concludes that like alcohol, the health risks of smoking cigarettes were so well known in the community as to be beyond dispute when Grinnell began smoking in 1952. In reality, there is little basis for distinguishing between alcohol and tobacco products in this context. *See* RESTATEMENT (SECOND) OF TORTS, § 402A cmt. j (1965); *see also Allgood v. R.J. Reynolds Tobacco Co.*, 80 F.3d 168, 172 (5th Cir.1996) (following *McGuire*, the defendant had no duty to warn of the dangers of smoking); *Roysdon v. R.J. Reynolds Tobacco Co.*, 623 F.Supp. 1189, 1191 (E.D.Tenn.1985) (following state supreme court's judicial notice of the public understanding of the dangers inherent in alcohol, trial court found that knowledge of the harmful health effects of cigarette smoking is part of the common knowledge of the community), *aff'd*, 849 F.2d 230 (6th Cir.1988); *Paugh v. R.J. Reynolds Tobacco Co.*, 834 F.Supp. 228, 231 (N.D.Ohio 1993) (same). I would not give our unanimous opinion in *McGuire* such short shrift.

Finally, the Court rather paradoxically paints with too broad a stroke by giving, at best, vague definition to the "general health risks" that are so commonly known in the community as to be beyond dispute. What we are able to learn from the Court about these "general health risks" is that they include lung cancer, but not addiction. What about other smoking-related health risks? Other cancers? Lip cancer? Throat cancer?

Stomach cancer? Emphysema? Bronchitis? Coronary heart disease? Low birth weight and infant mortality? What about the risk of stroke in women taking oral contraceptives? Are these risks within those "general health risks" of smoking that the Court today holds are so commonly known in the community as to be beyond dispute? Since King James I of England first condemned smoking as "a custom loathsome to the eye, hateful to the nose, harmful to the brain, [and] dangerous to the lungs," we have known that smoking cigarettes is bad for us. James I, Counterblaste to Tobacco (London 1604), *reprinted by* Da Capo Press (New York 1969). The Court begins a descent down a very slippery slope by attempting to parse out addiction as a separate and specific smoking-related health risk without giving definition to those risks it deems are within the common knowledge.

Moreover, the Court's determination to single out one particular risk conflicts with our analysis in *Shears*, 911 S.W.2d at 381. There the alleged failure to warn was of the risks of operating a front-end loader without a rollover protection structure. The plaintiff's injury occurred not as a result of a rollover, but from a rear-end collision. *Id.* We did not parse out and examine the particular risk of injury from a rear-end collision. Rather, we examined that risk as part of the more general safety risk of operating the front-end loader from an exposed and unprotected driver's seat. Under the Court's particularized-risk approach, the result in *Shears* would be different today.

Given the Court's decision today, the common knowledge doctrine retains little if any relevance in our products liability jurisprudence because the specific trumps the general. We can now say "I knew smoking was bad for me and could even kill me, but I didn't know I could become addicted."[1]

1. The Court cites *Crocker v. Winthrop Lab., Div. of Sterling Drug, Inc.*, 514 S.W.2d 429 (Tex. 1974), for the proposition that we have "recognized the seriousness of addiction and the need for manufacturers to warn of this danger in the context of prescription drugs." 951 S.W.2d at 429. *Crocker* is inapposite. First, it involved a prescription drug (talwin) prescribed by a doctor for relief of pain brought on by amputation of

part of the patient's thumb. 514 S.W.2d at 430. Wiley Grinnell, Jr., on the other hand, did not use cigarettes for health reasons; rather, he knowingly and willingly elected to smoke cigarettes despite the commonly known "general health risks." Second, we stated in *Crocker* that "the record ... shows that talwin is a good and useful drug which has no adverse side effects upon the great majority of people who use it but

There are limits to what the law can and should require in warnings. The Court's retreat from *McGuire* may sap the common knowledge doctrine of any vitality it has in the law.

## II

I also dissent from the Court's holding that the Grinnells' claim regarding the presence of pesticides is a "manufacturing defect" claim that must be remanded for trial. The Court states that a manufacturing defect claim is predicated on "a deviation from planned output." 951 S.W.2d at 434 (citing *Ford Motor Co. v. Pool,* 688 S.W.2d 879, 881 (Tex.App.—Texarkana 1985), *aff'd in part and rev'd in part on other grounds,* 715 S.W.2d 629 (Tex.1986)). Curiously, the Court then concludes that the pesticide claim is a manufacturing defect claim, *not* a design defect claim, even though "[a]ccording to the undisputed facts, pesticide residue is incidentally, yet normally, found in tobacco after it is fumigated." 951 S.W.2d at 434. I am not persuaded that the pesticide claim is in fact a manufacturing defect claim.

The Court cites a negligence case for the proposition that the entire tobacco industry can be guilty of the same "manufacturing defect" if pesticides are present "in many if not all cigarettes" and if, presumably, no one "intend[ed] to incorporate" them into the product. *Id.* at 434 (citing *T.J. Hooper,* 60 F.2d 737, 740 (2nd Cir.), *cert. denied,* 287 U.S. 662, 53 S.Ct. 220, 77 L.Ed. 571 (1932)). Even if the Court is correct in presuming that American did not "intend to incorporate" pesticides into its cigarettes, this does not convert the pesticide claim into a manufacturing defect claim. The summary judgment proof demonstrated that the cigarettes did not deviate from planned output. Accordingly, the pesticide claim is a design defect claim. For the reasons articulated by the Court in part I.A.2 of its opinion, I would hold that summary judgment was proper for all design defect claims, including those related to the presence of pesticides in American's products.

that it did harm Glenn Crocker because he was one of those people, perhaps not appreciable in number, who was susceptible to addiction or dependency upon the drug." *Id.* at 432. The

## III

The Court announces today that summary judgment in favor of American was proper "to the extent" that the claims "relate to the general health risks associated with smoking" but not "to the extent" that the claims are "based on the allegation that the addictive nature of cigarettes rendered American's products unreasonably dangerous." 951 S.W.2d at 432. This is a distinction without content. I would adhere to our holding in *McGuire* and find that all of the Grinnells' failure-to-warn related claims are barred by the common knowledge doctrine. Moreover, I would hold that summary judgment was proper on all of the Grinnells' design defect claims, including those predicated on the presence of pesticides.

Court does not find here that cigarettes are "good and useful." Indeed, cigarettes have long been commonly known to be harmful when used in the manner they are intended to be used.