Rondell FAGAN, Oscar Chavez, and John B. Ward, Appellants,

v.

Coy GNADE, et al., Appellees.

Rondell Fagan, Oscar Chavez, and John B. Ward, Appellants,

v.

Jennifer Sees, et al., Appellees.

Nos. 10–01–068–CV, 10–01–117–CV.

Court of Appeals of Texas, Waco.

Sept. 19, 2001.

Randall K. Hill, Assistant Attorney General, Transportation Division, Austin, for Appellant.

David Broiles, Kevin Byrne, Fort Worth, for Appellee.

Before Chief Justice DAVIS, Justice VANCE, and Justice GRAY.

DAVIS, Chief Justice.

## OPINION

Appellees [1] filed suit against Texas Department of Transportation employees Rondell Fagan, Oscar Chavez, John Ward (collectively, "Appellants") and others for injuries and fatalities suffered as a result of vehicular accidents which occurred in a construction zone along an interstate highway. Appellants filed a motion for summary judgment premised on official immunity. They appeal the court's denial of their summary judgment motion. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 51.014(a)(5) (Vernon Supp.2001). They claim in two issues that they established official immunity as a matter of law because: (1) the acts of which Appellees complain were acts of governmental discretion; and (2) the complained-of acts were performed in good faith.

## BACKGROUND[2]

### THE PROJECT

In 1997, Texas Department of Transportation ("TxDOT") engineers developed plans for "pavement rehabilitation and shoulder repair" to a 5–mile segment of Interstate Highway 35W in northern Tarrant County from U.S. Highway 287 to the Denton County line. The original plans called for the contractor to mill the "one

---

1. Appellees consist of multiple plaintiffs in two separate lawsuits which involve virtually identical issues and claims.

2. The "facts" in this case are largely undisputed. To the extent the record contains conflicting evidence, we disregard those conflicts and accept the evidence favorable to the Appellees as true. *See Great Am. Reserve Ins. Co. v. San Antonio Plumbing Supply Co.* ., 391 S.W.2d 41, 47 (Tex.1965); *Fletcher v. Edwards,* 26 S.W.3d 66, 73 (Tex.App.—Waco 2000, pet. denied).

course surface treatment" from the shoulders.[3] The contractor would then scarify the underlying flexible base to a depth of 101 millimeters;[4] recompact the flexible base with additional materials; replace the milled one course surface treatment; and apply a 50–millimeter–deep layer of asphalt across the traffic lanes and shoulders.[5] A cross-section of the original plans appears as follows:

The original plans also included traffic safety proposals to be employed during the course of the project. The original plans called for a 1.219–meter–wide "buffer zone" on the shoulder-side of the traffic lane in areas where the contractor removed surface materials from the shoulder to depths of between 50 and 600 millimeters.[6] The contractor was to mark off the buffer zone with 100–millimeter–wide white or yellow pavement marking (stripes) and orange- and white-striped plastic barrels with warning lights atop. A schematic of these safety proposals appears as follows:

**3.** According to the record, the "one course surface treatment" is a thin layer of asphalt intermixed with rock.

**4.** The term "scarify" means "to break up and loosen the surface of." *See* MERRIAM–WEBSTER'S COLLEGIATE DICTIONARY 1042 (10th ed.1993).

**5.** The parties make inconsistent references to metric and American units of measurement. Because the plans and most of the technical exhibits in the record use metric units, we will endeavor to use metric references for consistency. Where the record provides only an American unit of measurement, we will supply a metric equivalent based on the formula that 1 inch=25.4 millimeters. *Id.* at 1341 (weights and measures table). (Appellant Rondell Fagan also provided deposition testimony that an inch equals 25.4 millimeters.)

**6.** The proposed "buffer zone" would decrease the width of the 3.657 meter wide traffic lane by 1/3.

TREATMENT FOR PAVEMENT DROP-OFFS

The local TxDOT engineer who drew up the plans forwarded them through the area, district, and state offices for administrative approval. This administrative review resulted in three pertinent modifications to the original plans: (1) a narrowing of the proposed "buffer zone" from 1.219 to 0.620 meters accompanied by a requirement that the contractor "shoulder up" against the pavement edge at the end of each day, which would allow the use of vertical panels as warning devices and create a wider traffic lane;[7] (2) a requirement that the contractor work on only one side of the highway at a time; and (3) a requirement that the contractor replace the one course surface treatment on the finished flexible base shoulder before detouring traffic to the lane adjacent to the shoulder.[8] The engineer who drafted the original plans incorporated these modifications as recommended. He included the first modification in Sheet 14 of the plans. The latter two appear in Sheet 3D. A schematic of the modified safety proposals in Sheet 14 appears as follows:

TREATMENT FOR PAVEMENT DROP-OFFS

TxDOT executed a contract with Champagne–Webber, Inc. ("C–W") to implement these plans. C–W engaged Dustrol, Inc. as a subcontractor to mill the shoulder surfaces. Dustrol began milling the shoulder surfaces on April 23, 1998. Dustrol began with the inside (median) shoulder on

7. A "vertical panel" is an orange- and white-striped, rectangular warning device about 200–300 millimeters wide and 600 millimeters tall. "Shouldering up" is accomplished by placing asphalt against the pavement edge in a tapered fashion to provide a gradual transition from the pavement to the shoulder rather than a sudden drop-off.

8. The plans required the contractor to close the adjacent traffic lane whenever shoulder work was being performed. The latter recommendation was apparently made to ensure that, whenever a lane closure occurred, traffic would not be forced to drive between a shoulder drop-off on one side and the closed lane on the other.

the southbound-side of the interstate, removing the one course surface treatment to a depth of approximately ½ inch (12.7 millimeters). On April 24, Dustrol completed the milling of the inside, southbound shoulder and began milling the outside, southbound shoulder.

In one area of this outside shoulder, Dustrol removed asphalt to a depth of about 4 inches (101.6 millimeters) for a length of 800 feet near Park Glen Boulevard.[9] Before commencing the milling of this portion of the shoulder, Hidalgo discussed some safety concerns with TxDOT inspector John Ward and C–W project superintendent Tim Champagne. Hidalgo asked whether they should shoulder-up this segment of the shoulder. Ward told Hidalgo that this was unnecessary. Champagne told Hidalgo he would place warning signs and cones along this drop-off. Champagne directed Hidalgo not to shoulder-up this section of the roadway. Dissatisfied with this response, Hidalgo discussed the matter with his Dustrol supervisor. The supervisor advised Hidalgo to make sure that the warning signs were set out and that there was "some form of delineation" to indicate the location of the drop-off.

According to Hidalgo, C–W placed warning signs and cones along the shoulder before this milling took place. The 4–inch drop-off near Park Glen Boulevard remained for "five [or] six days." At that point, Dustrol milled 2 inches (50.8 millimeters) of asphalt from the surface of the adjoining southbound traffic lane, reducing the shoulder drop-off to 2 inches (50.8 millimeters).

Hidalgo encountered a similar situation (4–inch depth) along a 100–foot section of the inside, northbound shoulder near Westport Parkway. C–W placed warning signs and cones along the shoulder before Dustrol milled this portion of the shoulder as well. So long as Hidalgo was involved in the milling operation, the 4–inch drop-off remained along this portion of the interstate.

At some point in late April 1998, acting District Engineer Rondell Fagan discovered that the contract price for the project was $1.2 million less than the funds available for the project. He sought to determine whether these unallocated funds were available to add an additional layer of asphalt across the traffic lanes and shoulders. Fagan contacted Assistant Area Engineer Oscar Chavez, who was the engineer in charge of the project. When Chavez reviewed the plans and Fagan's proposal, he discovered that the quantity of materials needed to complete the original contract had been substantially underestimated. The cost of the necessary additional materials was about $1.2 million.

At about the same time, Fagan reviewed the plans and decided that they were not designed as he had envisioned. He directed Chavez to implement a second change in the project which would require the contractor to remove 50 millimeters of the flexible base from the shoulders and replace it with asphalt, rather than scarifying and reworking the flexible base. Fagan testified that he made this change in an effort to inhibit water infiltration into the joints between the concrete traffic lanes and the shoulders, thus retarding deterioration of both.[10]

---

9. Dustrol employee Mario Hidalgo provided deposition testimony that milling to this greater depth was required because "asphalt patches" were present in this area of the shoulder which had to be removed to reach the flexible base which was to be scarified and reworked.

10. Fagan explained that a "fabric underseal" would be laid across the traffic lanes and

Before directing Chavez to prepare the necessary paperwork to implement these modifications, Fagan contacted TxDOT's Executive Director Charles Wesley Heald on or about April 30 to obtain verbal approval for the proposed modifications.[11] Heald gave verbal approval to Fagan's proposals.

According to Chavez, Fagan then instructed him to direct C–W to begin implementation of the proposed modifications. Chavez passed this directive along to C–W project manager Carl Kortes on May 1. In a letter to Chavez's supervisor Ronald Newman, Kortes objected to implementation of the second proposal without a written change order because it would require C–W to provide additional materials the cost of which had not yet been quantified and because the cost of these additional materials had not been accounted for in C–W's original bid.

Apparently at Newman's request, Chavez discussed the matter further with Kortes. In a memo written in the margin of Kortes's letter to Newman, Chavez noted that he had assured Kortes that "any amounts agreed upon on the new items would be fair to them. [Kortes] still expressed concern but was in agreement." According to a diary entry by TxDOT Construction Inspector John Ward, Chavez relayed the proposed modifications to Ward on May 12. Champagne testified in his deposition that TxDOT initially instructed C–W to mill 3 inches (76.2 millim-

eters) from the shoulders. Accordingly, Dustrol started milling 3 inches of flexible base from the shoulders, beginning at the Denton County line. The next day, TxDOT instructed C–W to mill only 2 inches (50.4 millimeters) from the shoulders. Dustrol finished the job on May 22.

To add the additional materials necessary to complete the project as originally planned, Chavez prepared "Change Order No. 1" on June 9.[12] Kortes signed this change order on behalf of C–W on July 8. Area Engineer Newman signed the change order on July 12, requesting approval by his superiors. Three other TxDOT officials signed the change order thereafter, with the last signing on July 29, indicating his approval of the change order.

To implement Fagan's proposal to remove 50 millimeters of flexible base from the shoulders and replace it with asphalt, Chavez prepared "Change Order No. 2" on August 14.[13] Kortes signed this change order on August 17 as did Chavez.[14] District Construction Engineer Robert Julian signed this change order on September 2. Change Order No. 2 resulted in a $123,000 reduction in the cost of the project.

## THE ACCIDENTS

From May 30 through August 15, at least nine accidents occurred in the area where C–W and Dustrol were working. In each instance, the shoulder drop-off is alleged to be a contributing factor.

shoulders before the final, 50–millimeter asphalt overlay was applied.

11. Heald had been the District Engineer over the Fort Worth TxDOT office and Fagan's immediate supervisor before being promoted to the Executive Director's position.

12. The attachments accompanying "Change Order No. 1" are dated June 1. Chavez's signature on each of these attachments is dated June 9.

13. Chavez's signature on the attachments accompanying "Change Order No. 2" are dated August 14. He signed the change order itself on August 17.

14. Chavez signed the change order "for" the Area Engineer, indicating that the Area Engineer "approved" it.

On May 30, Wanda Roderick died and her children were injured when their Ford Explorer went over the outside shoulder drop-off and overturned when she attempted to return to the traffic lane.[15] Roderick's accident occurred on the northbound side of the interstate about ¼ mile south of the Golden Triangle Boulevard exit. Measurements of the shoulder edge at this location indicated a drop-off in excess of 2½ inches (63.5 millimeters).

Ruby Martinez died and a passenger suffered injuries on June 3 when Martinez's Ford Taurus went over the inside shoulder drop-off and overturned when she attempted to return to the traffic lane.[16] Martinez's accident occurred on the southbound side of the interstate in the same vicinity as Roderick's.[17] A witness to the accident estimated in his deposition that the shoulder drop-off at this location was between 4 and 5 inches (101.6 to 127 millimeters).

Jaclyn Jimenez suffered injuries on June 17 when her Mitsubishi Eclipse went over the outside shoulder drop-off and overturned when she attempted to re-enter the traffic lane.[18] Jimenez's accident occurred on the southbound side of the interstate about ⁷⁄₁₀ mile south of Park Glen Boulevard.

Hannah Toten died from injuries sustained on June 26 when her Dodge Neon went over the outside shoulder drop-off and overturned when she attempted to return to the traffic lane.[19] Toten's accident occurred on the northbound side of the interstate in the same vicinity as Jimenez's.[20] Appellees provided photographic evidence that the shoulder drop-off at this location exceeded 2½ inches (63.5 millimeters).

Christie Tarver suffered injury and Michael Sees died on July 2 as a result of a collision which occurred when Tarver's Mitsubishi Eclipse went over the inside shoulder drop-off, veered across the median when she attempted to return to the traffic lane, and collided with Sees's Honda Civic.[21] Tarver ran off the road in the same vicinity as Roderick.[22] A report apparently prepared by an investigating officer indicates that the drop-off at this location was between 2 and 3 inches (50.8 to 76.2 millimeters).[23]

15. Wanda Roderick's husband Kirk, as heir and personal representative of her estate and as next friend for their children, is a party to trial court cause no. C–2000–00219 and our appellate cause no. 10–01–068–CV (the "Gnade appeal"). Wanda Roderick's mother Rosemarie Warren, as next friend for Wanda's other child, is also a party to the Gnade appeal.

16. Ruby Martinez's husband Rogelio Cadena, Jr., as heir and personal representative of her estate, and her parents Porfirio and Mary Martinez are parties to the Gnade appeal.

17. The accident report indicates that it occurred about ¼ mile north of Park Glen Boulevard.

18. Jimenez is not a party to the underlying litigation.

19. Hannah Toten's parents Arvel and Gerry Toten, as heirs and representatives of her estate, are parties to trial court cause no. C–2000–00255 and our appellate cause no. 10–01–117–CV (the "Sees appeal").

20. The accident report indicates that Toten's accident occurred ¼ mile south of Park Glen Boulevard.

21. Michael Sees's wife Jennifer, as heir and representative of his estate and as next friend for their children is a party to the Sees appeal. Tarver is a third-party defendant in trial court cause no. C–2000–00255 (the underlying Sees litigation).

22. The accident report indicates that the collision occurred ½ mile north of Park Glen Boulevard.

23. This report was included in a TxDOT fax from traffic engineer Wallace Ewell to area engineer Ronald Newman informing Newman that "two more fatalities" had occurred.

Becky Jones, her daughter, and her daughter's friend sustained injuries on July 15 when Jones's Ford Expedition went over the outside shoulder drop-off and overturned as she attempted to re-enter the traffic lane.[24] This accident occurred on the southbound side of the interstate in the same vicinity as Jimenez's.[25] The accident report indicates a shoulder drop-off of between 3 and 4 inches (76.2 to 101.6 millimeters).

Michael Smith suffered injury on August 4 when his Nissan pickup went over the inside shoulder drop-off on the northbound side of the interstate, overturned as he tried to return to the traffic lane, slid across the median and the southbound traffic lanes, overturned again, and came to rest in the grass between the southbound outside shoulder and the southbound access road.[26] Smith estimated the shoulder drop-off to be about 4 inches deep (101.6 millimeters). Smith's accident occurred in the same vicinity as the Roderick and Tarver accidents.[27]

Melissa Gnade and her passenger Michelle Reynolds suffered fatal injuries on August 10 when Gnade's Ford Tempo went over the inside shoulder drop-off on the northbound side of the interstate, crossed the median as she tried to re-enter the traffic lane, and collided with a car coming in the opposite direction.[28] Witness estimates of the shoulder drop-off where Gnade's car left the highway varied from 2 to 3 inches (50.8 to 76.2 millimeters). Gnade's collision occurred in the same vicinity as the Roderick, Tarver, and Smith accidents.[29]

The last accident pertinent to this appeal occurred on August 15 when Matthew Merrill's Chrysler LHS went over the inside shoulder drop-off on the northbound side of the interstate, crossed back over both northbound lanes when he attempted to return to the traffic lane, and overturned several times before coming to rest in the grass beyond the outside shoulder. Merrill's wife and daughter suffered injuries in this accident.[30] The record is silent regarding any estimate of the shoulder drop-off where Merrill's car left the highway. The Merrill accident occurred in the same vicinity as the Roderick, Tarver, Smith, and Gnade accidents.[31]

## SHOULDERING UP

TxDOT inspector Ward indicated in a diary entry for June 15 that he had "men-

24. None of the occupants of Becky Jones's vehicle is a party to the underlying litigation.

25. The accident report indicates that the accident occurred 1.2 miles south of Golden Triangle Boulevard. A diagram accompanying the report depicts Jones's vehicle driving over the drop-off to the north of the Park Glen Boulevard overpass and overturning and coming to rest south of Park Glen.

26. Smith is not a party to the underlying litigation.

27. The accident report indicates that it occurred 1/10 mile south of Golden Triangle Boulevard.

28. Melissa Gnade's parents Robert and Lois Gnade are parties to the Gnade appeal. They are parties collectively as Melissa's heirs.

Robert also appears in his capacity as guardian of the estate of Melissa's minor child. Michelle Reynolds's husband Noel, as heir and representative of her estate, is a party to the Sees appeal.

29. The accident report indicates that the collision occurred 0.25 miles south of Golden Triangle Boulevard. The driver of the other vehicle suffered a broken ankle.

30. The Merrills are not parties to the underlying litigation.

31. A diagram included in the accident report indicates that the Merrills' car came to rest about 1300 feet south of Golden Triangle Boulevard.

tioned" to Chavez that, if no shoulder work was to be done for a period of time because the change orders had not yet been approved, the pavement edges "should probably be" shouldered-up.

Kortes met with Ward on July 1 to discuss the effect of Change Order No. 1.[32] According to a diary entry by Ward for that date, Kortes informed Ward that he did not believe C–W should be responsible for shouldering-up the pavement edges apparently because of the cost of materials needed to do so. Kortes told Ward that, if C–W was required to shoulder-up, it should be paid additional compensation. Ward advised Kortes as follows:

> I told him that the safe passage of Traffic thru Project was his Responsibility and if he felt he needed to Shldr. up he should do so and he could use the material initially Removed from Shldrs. I also told him he did not have to Sldr. up full width he could just bring it out about 1 m from pav. edge.

C–W began shouldering-up the pavement edges on July 7.

Additional diary entries by Ward indicate that C–W continued to shoulder-up the pavement edges throughout July. However, photographic evidence, accident reports, witness statements, and deposition testimony reflect that none of the shoulders where the accidents occurred was shouldered-up at the time of the accidents.

## THE LITIGATION

Appellees filed the underlying lawsuits against Appellants seeking to establish their liability under general negligence theories.[33] Appellees contend that Appellants are liable because:

- they did not have the discretion or authority to direct or permit C–W or Dustrol to mill 50 millimeters of flexible base from the shoulders before Change Order No. 2 was executed;

- they permitted or caused the inside and outside shoulders to be milled at the same time rather than requiring that one shoulder be restored before work commenced on the opposite shoulder as Sheet 3D of the TxDot/C–W contract required; and

- they permitted or caused the shoulders to remain milled to depths exceeding 50 millimeters without requiring the implementation of the traffic safety proposals indicated in Sheet 14 of the contract.

Appellants contend in their summary judgment motions that their conduct in this regard is shielded by official immunity because each of the complained-of acts was within their discretionary authority and performed in good faith.

## STANDARD OF REVIEW

■ To prevail on a summary judgment motion, the movants must demonstrate that there are no genuine issues of material fact and that they are entitled to judgment as a matter of law. *See American Tobacco Co. v. Grinnell*, 951 S.W.2d 420, 425 (Tex.1997); *Nixon v. Mr. Prop. Management Co.*, 690 S.W.2d 546, 548 (Tex. 1985); *Fletcher v. Edwards*, 26 S.W.3d 66, 73 (Tex.App.—Waco 2000, pet. denied). We conduct a *de novo* review in a sum-

---

**32.** Because the second change order (which had not yet been executed) would implement Fagan's recommendation that C–W mill 50 millimeters of the flexible base (which Dustrol had already done) and replace it with asphalt rather than re-work the flexible base, Kortes questioned whether TxDOT had reverted back to the original plans.

**33.** The parties in the Sees appeal also assert fraudulent concealment and negligence *per se* claims.

mary judgment case. *See Macias v. Rylander*, 40 S.W.3d 679, 683 (Tex.App.—Austin 2001, pet. denied); *Coleman v. Cintas Sales Corp.*, 40 S.W.3d 544, 547 (Tex. App.—San Antonio 2001, pet. denied); *Rucker v. Bank One, Tex., N.A.*, 36 S.W.3d 649, 653 (Tex.App.—Waco 2000, pet. filed). We disregard all conflicts in the evidence and accept the evidence favoring the non-movants as true. *See Great Am. Reserve Ins. Co. v. San Antonio Plumbing Supply Co.*, 391 S.W.2d 41, 47 (Tex.1965); *Fletcher*, 26 S.W.3d at 73. We indulge every reasonable inference from the evidence in favor of the nonmovants and resolve any doubts in their favor. *See American Tobacco*, 951 S.W.2d at 425; *Fletcher*, 26 S.W.3d at 73.

## APPLICATION

Appellants argue in their first issue that the acts of which Appellees complain were discretionary in nature because they involved professional engineering decisions and because the shoulder drop-offs at issue did not invoke the safety requirements of Sheet 14. They contend in their second issue that they performed such acts in good faith.

### Official Immunity

■ Government employees have official immunity from suit or liability which arises from their performance of discretionary duties which are within the scope of their authority and which are done in good faith. *See University of Houston v. Clark*, 38 S.W.3d 578, 580 (Tex.2000); *City of Lancaster v. Chambers*, 883 S.W.2d 650, 653 (Tex.1994). Whether a governmental action is a discretionary function is a question of law. *See State v. Miguel*, 2 S.W.3d 249, 251 (Tex.1999) (per curiam).

■ In the context of highway construction projects, decisions about highway design and what type of safety features to employ "are discretionary policy decisions." *Id.* However, the implementation of these policy decisions at the subordinate or operational level is a ministerial function not shielded by official immunity. *See State v. Terrell*, 588 S.W.2d 784, 787–88 (Tex.1979); *McClure v. Reed*, 997 S.W.2d 753, 756 (Tex.App.—Tyler 1999, no pet.); *Mitchell v. City of Dallas*, 855 S.W.2d 741, 745 (Tex.App.—Dallas 1993), *aff'd*, 870 S.W.2d 21 (Tex.1994).

■ Because official immunity is an affirmative defense, Appellants must conclusively establish each element of their immunity claim. *See Clark*, 38 S.W.3d at 580.

### Discretionary or Ministerial Acts?

■ As the Supreme Court explained in *Miguel*, "Decisions about highway design and what type of safety features to install are discretionary policy decisions." *Miguel*, 2 S.W.3d at 251. TxDOT policies and procedures clearly vest TxDOT's Executive Director and his authorized representatives with the discretion to effect changes in construction plans "at any time during the work." *See* Texas Dep't of Transp, Standard Specifications for Construction and Maintenance of Highways, Streets, and Bridges item 1.21, at 3, item 4.2, at 19–20 (1995). Thus, we agree with Appellants that their conduct in proposing and executing the change orders at issue in this case falls within the category of "discretionary policy decisions" "about highway design" contemplated by *Miguel*.[34]

---

**34.** Even assuming Appellants failed to properly execute the change orders, the negligent or erroneous performance of a discretionary function is shielded by official immunity so long as it was done in good faith. *See Albright v. Texas Dep't of Human Servs.*, 859

Regarding the implementation of the traffic safety proposals contained in Sheet 14, Appellants contend that "the field personnel were acting as authorized representatives of the Engineer" and had the discretion not to implement these proposals because the drop-offs at issue were "two inches or less." They acknowledge that there was an "occasional variance" from this depth but assert that such variances did not "change the overall treatment of the job, for engineering purposes, as being equivalent to 50mm/2 inches." They cite *Miguel* for the proposition that "field personnel" acting in this capacity have discretion regarding whether to implement traffic safety proposals contained in the plans.

For shoulder drop-offs of 50 millimeters or more, Sheet 14 required the establishment of a 0.620–meter–wide "buffer zone" along the shoulder-side of the traffic lane, marked off by 100–millimeter–wide white or yellow stripes and vertical panels. Sheet 14 also required that the contractor "shoulder up" against the pavement edge at the end of each day in areas where such depths were present.

Appellants presented evidence of a policy in the Fort Worth TxDOT district that no safety precautions are required when shoulder drop-off depths are 50 millimeters or less. They refer to this as the "Fort Worth policy." They contend that field personnel have the discretion to decide whether a particular shoulder drop-off is sufficiently shallow to apply this policy and employ no safety precautions. They aver that the exercise of such discretion is the type of policy-making discretion contemplated in *Miguel.* We disagree.

The Supreme Court has described the type of discretionary acts protected by official immunity as follows:

Ordinarily, official immunity extends to any action or decision by a state employee that is "discretionary." Discretionary functions receive protection, but ministerial duties do not. This distinction is admittedly problematic. We have explained the distinction as follows:

> Ministerial acts are those "[w]here the law prescribes and defines the duties to be performed with such precision and certainty as to leave nothing to the exercise of discretion or judgment ... but where the act to be done involves the exercise of discretion or judgment, it is not to be deemed merely ministerial".... If an action involves personal deliberation, decision and judgment, it is discretionary; actions which require obedience to orders or the performance of a duty to which the actor has no choice, are ministerial.

However, other courts have noted that most duties involve some measure of discretion, including purely ministerial duties. Labelling an act as discretionary is "probably only a shorthand notation for a more complex policy decision."

*Kassen v. Hatley,* 887 S.W.2d 4, 9 (Tex. 1994) (citations omitted).

■ We have little doubt that engineers, inspectors, and contractors do and must exercise some measure of discretion in the field when deciding how to implement highway construction plans and whether the circumstances require the use of traffic safety precautions specified by those plans. However, the exercise of such discretion is not the type of "complex policy decision" contemplated in *Kassen.* Rather, these are operational-level implementation decisions for which the decision-maker can be held liable. *See McClure,*

S.W.2d 575, 579 (Tex.App.—Houston [1st Dist.] 1993, no writ); *Russell v. Texas Dep't of*

*Human Resources,* 746 S.W.2d 510, 513 (Tex. App.—Texarkana 1988, writ denied).

997 S.W.2d at 756; *Mitchell*, 855 S.W.2d at 745.

At a minimum, the summary judgment evidence produced by Appellees raises a fact issue regarding whether the various shoulder drop-offs at the accident sites were 50 millimeters or greater. Sheet 14 imposed several safety requirements for shoulder drop-offs of such depth. The record establishes that none of these requirements was met with regard to the drop-offs at issue.

■ Because Appellants' decisions regarding whether to employ the safety precautions required by Sheet 14 are not the type of discretionary decisions protected by official immunity and because the record raises a genuine issue of material fact regarding whether the drop-offs at issue implicated the requirements of Sheet 14, we conclude that Appellants failed to establish as a matter of law that their conduct in this regard is shielded by official immunity. Accordingly, Appellants' first issue is without merit.

In light of this holding, we need not address Appellants' second issue.

We affirm the orders denying Appellants' summary judgment motions.