IN THE

TENTH COURT OF APPEALS




 
 
 
 
 
 
 


 



No. 10-08-00009-CV

 

In the
Matter of the Marriage of

Frances
Rebecca Lanham

and

William
Kenneth Lanham, III

and

in the
Interest of R. D. L. and K. B. L., Children

 

 



From the 82nd District Court

Robertson County, Texas

Trial Court No. 06-12-D10,173DV

 



MEMORANDUM  Opinion










 

            Appellant, William Kenneth Lanham,
III, filed a notice of appeal on January 2, 2008.  He has now filed a motion to dismiss his appeal stating that he no longer wishes to pursue the
appeal.  Appellee does not object to the relief sought.

            Accordingly, this appeal is
dismissed.  Tex. R. App. P.
42.1(a)(1).  As requested by Appellant, costs are assessed against Appellant.

 

                                                                                    TOM
GRAY

                                                                                    Chief
Justice

 

Before
Chief Justice Gray,

            Justice
Vance, and

            Justice
Reyna

Appeal
dismissed

Opinion
delivered and filed January 30, 2008

[CV06]






pan class="WPNormal">  The accident report indicates that it occurred 1/10 mile south of Golden Triangle Boulevard.
\
'

var WPFootnote28 = '  Melissa Gnade’s parents Robert and Lois Gnade are parties to the Gnade appeal. They are parties collectively\
as Melissa’s heirs. Robert also appears in his capacity as guardian of the estate of Melissa’s minor child. Michelle\
Reynolds’s husband Noel, as heir and representative of her estate, is also a party to the Gnade appeal.
\
'

var WPFootnote29 = '  The accident report indicates that the collision occurred 0.25 miles south of Golden Triangle Boulevard. The\
driver of the other vehicle suffered a broken ankle.
\
'

var WPFootnote30 = '  The Merrills are not parties to the underlying litigation.
\
'

var WPFootnote31 = '  A diagram included in the accident report indicates that the Merrills’ car came to rest about 1300 feet south of\
Golden Triangle Boulevard.
\
'

var WPFootnote32 = '  Because the second change order (which had not yet been executed) would implement Fagan’s recommendation\
that C-W mill 50 millimeters of the flexible base (which Dustrol had already done) and replace it with asphalt rather\
than re-work the flexible base, Kortes questioned whether TxDOT had reverted back to the original plans.
\
'

var WPFootnote33 = '  The parties in the Sees appeal also assert fraudulent concealment and negligence per se claims.
\
'

var WPFootnote34 = '  Even assuming Appellants failed to properly execute the change orders, the negligent or erroneous performance\
of a discretionary function is shielded by official immunity so long as it was done in good faith. See Albright v. Texas\
Dep’t of Human Servs., 859 S.W.2d 575, 579 (Tex. App.—Houston [1st Dist.] 1993, no writ); Russell v. Texas Dep’t\
of Human Resources, 746 S.W.2d 510, 513 (Tex. App.—Texarkana 1988, writ denied).
\
'

function WPShow( WPid, WPtext )
{
 if( bInlineFloats )
 eval( "document.all." + WPid + ".style.visibility = 'visible'" );
 else
 {
 if( floatwnd == 0 || floatwnd.closed )
 floatwnd = window.open( "", "comment", "toolbars=0,width=600,height=200,resizable=1,scrollbars=1,dependent=1" );
 floatwnd.document.open( "text/html", "replace" );
 floatwnd.document.write( "
\r\n" );
 floatwnd.document.write( "\r\n" );
 floatwnd.document.write( "
\r\n" );
 floatwnd.document.write( WPtext );
 floatwnd.document.write( '
Close');
 floatwnd.document.write( "
" );
 floatwnd.document.close();
 floatwnd.focus();
 }
}

function WPHide( WPid )
{
 if( bInlineFloats )
 eval( "document.all." + WPid + ".style.visibility = 'hidden'" );
}










WITHDRAWN
9/19/2001



IN THE
TENTH COURT OF APPEALS
 

No. 10-01-068-CV

     RONDELL FAGAN, OSCAR CHAVEZ,
     AND JOHN B. WARD,
                                                                         Appellants
     v.

     COY GNADE, ET AL.,
                                                                         Appellees
_____________

No. 10-01-117-CV

     RONDELL FAGAN, OSCAR CHAVEZ,
     AND JOHN B. WARD,
                                                                         Appellants
     v.

     JENNIFER SEES, ET AL.,
                                                                         Appellees
 

From the 249th District Court
Johnson County, Texas
Trial Court Nos. C-2000-00219 & C-2000-00255
                                                                                                                
                                                                                                         
O P I N I O N
                                                                                                                

      Appellees


 filed suit against Texas Department of Transportation employees Rondell Fagan,
Oscar Chavez, John Ward (collectively, “Appellants”) and others for injuries and fatalities
suffered as a result of vehicular accidents which occurred in a construction zone along an interstate
highway. Appellants filed a motion for summary judgment premised on official immunity. They
appeal the court’s denial of their summary judgment motion. See Tex. Civ. Prac. & Rem. Code
Ann. § 51.014(a)(5) (Vernon Supp. 2001). They claim in two issues that they established official
immunity as a matter of law because: (1) the acts of which Appellees complain were acts of
governmental discretion; and (2) the complained-of acts were performed in good faith.
BACKGROUND



The Project
      In 1997, Texas Department of Transportation (“TxDOT ”) engineers developed plans for
“pavement rehabilitation and shoulder repair” to a 5-mile segment of Interstate Highway 35W in
northern Tarrant County from U.S. Highway 287 to the Denton County line. The original plans
called for the contractor to mill the “one course surface treatment” from the shoulders.


 The
contractor would then scarify the underlying flexible base to a depth of 101 millimeters;



recompact the flexible base with additional materials; replace the milled one course surface
treatment; and apply a 50-millimeter-deep layer of asphalt across the traffic lanes and shoulders.


 
A cross-section of the original plans appears as follows:



      The original plans also included traffic safety proposals to be employed during the course of
the project. The original plans called for a 1.219-meter-wide “buffer zone” on the shoulder-side
of the traffic lane in areas where the contractor removed surface materials from the shoulder to
depths of between 50 and 600 millimeters.


 The contractor was to mark off the buffer zone with
100-millimeter-wide white or yellow pavement marking (stripes) and orange- and white-striped
plastic barrels with warning lights atop. A schematic of these safety proposals appears as follows:



 
 
 
 
 
      The local TxDOT engineer who drew up the plans forwarded them through the area, district,
and state offices for administrative approval. This administrative review resulted in three pertinent
modifications to the original plans: (1) a narrowing of the proposed “buffer zone” from 1.219 to
0.620 meters accompanied by a requirement that the contractor “shoulder up” against the
pavement edge at the end of each day, which would allow the use of vertical panels as warning
devices and create a wider traffic lane;


 (2) a requirement that the contractor work on only one
side of the highway at a time; and (3) a requirement that the contractor replace the one course
surface treatment on the finished flexible base shoulder before detouring traffic to the lane adjacent
to the shoulder.


 The engineer who drafted the original plans incorporated these modifications as
recommended. He included the first modification in Sheet 14 of the plans. The latter two appear
in Sheet 3D. A schematic of the modified safety proposals in Sheet 14 appears as follows:



 
 
 
 
 
 
      TxDOT executed a contract with Champagne-Webber, Inc. (“C-W”) to implement these
plans. C-W engaged Dustrol, Inc. as a subcontractor to mill the shoulder surfaces. Dustrol began
milling the shoulder surfaces on April 23, 1998. Dustrol began with the inside (median) shoulder
on the southbound-side of the interstate, removing the one course surface treatment to a depth of
approximately ½ inch (12.7 millimeters). On April 24, Dustrol completed the milling of the
inside, southbound shoulder and began milling the outside, southbound shoulder.
      In one area of this outside shoulder, Dustrol removed asphalt to a depth of about 4 inches
(101.6 millimeters) for a length of 800 feet near Park Glen Boulevard.


 Before commencing the
milling of this portion of the shoulder, Hidalgo discussed some safety concerns with TxDOT
inspector John Ward and C-W project superintendent Tim Champagne. Hidalgo asked whether
they should shoulder-up this segment of the shoulder. Ward told Hidalgo that this was
unnecessary. Champagne told Hidalgo he would place warning signs and cones along this drop-off. Champagne directed Hidalgo not to shoulder-up this section of the roadway. Dissatisfied
with this response, Hidalgo discussed the matter with his Dustrol supervisor. The supervisor
advised Hidalgo to make sure that the warning signs were set out and that there was “some form
of delineation” to indicate the location of the drop-off. 
      According to Hidalgo, C-W placed warning signs and cones along the shoulder before this
milling took place. The 4-inch drop-off near Park Glen Boulevard remained for “five [or] six
days.” At that point, Dustrol milled 2 inches (50.8 millimeters) of asphalt from the surface of the
adjoining southbound traffic lane, reducing the shoulder drop-off to 2 inches (50.8 millimeters). 
      Hidalgo encountered a similar situation (4-inch depth) along a 100-foot section of the inside,
northbound shoulder near Westport Parkway. C-W placed warning signs and cones along the
shoulder before Dustrol milled this portion of the shoulder as well. So long as Hidalgo was
involved in the milling operation, the 4-inch drop-off remained along this portion of the interstate.
      At some point in late April 1998, acting District Engineer Rondell Fagan discovered that the
contract price for the project was $1.2 million less than the funds available for the project. He
sought to determine whether these unallocated funds were available to add an additional layer of
asphalt across the traffic lanes and shoulders. Fagan contacted Assistant Area Engineer Oscar
Chavez, who was the engineer in charge of the project. When Chavez reviewed the plans and
Fagan’s proposal, he discovered that the quantity of materials needed to complete the original
contract had been substantially underestimated. The cost of the necessary additional materials was
about $1.2 million.
      At about the same time, Fagan reviewed the plans and decided that they were not designed
as he had envisioned. He directed Chavez to implement a second change in the project which
would require the contractor to remove 50 millimeters of the flexible base from the shoulders and
replace it with asphalt, rather than scarifying and reworking the flexible base. Fagan testified that
he made this change in an effort to inhibit water infiltration into the joints between the concrete
traffic lanes and the shoulders, thus retarding deterioration of both.



      Before directing Chavez to prepare the necessary paperwork to implement these modifications,
Fagan contacted TxDOT’s Executive Director Charles Wesley Heald on or about April 30 to
obtain verbal approval for the proposed modifications.


 Heald gave verbal approval to Fagan’s
proposals.
      According to Chavez, Fagan then instructed him to direct C-W to begin implementation of
the proposed modifications. Chavez passed this directive along to C-W project manager Carl
Kortes on May 1. In a letter to Chavez’s supervisor Ronald Newman, Kortes objected to
implementation of the second proposal without a written change order because it would require
C-W to provide additional materials the cost of which had not yet been quantified and because the
cost of these additional materials had not been accounted for in C-W’s original bid.
      Apparently at Newman’s request, Chavez discussed the matter further with Kortes. In a
memo written in the margin of Kortes’s letter to Newman, Chavez noted that he had assured
Kortes that “any amounts agreed upon on the new items would be fair to them. [Kortes] still
expressed concern but was in agreement.” According to a diary entry by TxDOT Construction
Inspector John Ward, Chavez relayed the proposed modifications to Ward on May 12. 
Champagne testified in his deposition that TxDOT initially instructed C-W to mill 3 inches (76.2
millimeters) from the shoulders. Accordingly, Dustrol started milling 3 inches of flexible base
from the shoulders, beginning at the Denton County line. The next day, TxDOT instructed C-W
to mill only 2 inches (50.4 millimeters) from the shoulders. Dustrol finished the job on May 22.
      To add the additional materials necessary to complete the project as originally planned,
Chavez prepared “Change Order No. 1” on June 9.


 Kortes signed this change order on behalf
of C-W on July 8. Area Engineer Newman signed the change order on July 12, requesting
approval by his superiors. Three other TxDOT officials signed the change order thereafter, with
the last signing on July 29, indicating his approval of the change order.
      To implement Fagan’s proposal to remove 50 millimeters of flexible base from the shoulders
and replace it with asphalt, Chavez prepared “Change Order No. 2" on August 14.


 Kortes
signed this change order on August 17 as did Chavez.


 District Construction Engineer Robert
Julian signed this change order on September 2. Change Order No. 2 resulted in a $123,000
reduction in the cost of the project.
The Accidents
      From May 30 through August 15, at least nine accidents occurred in the area where C-W and
Dustrol were working. In each instance, the shoulder drop-off is alleged to be a contributing
factor.
      On May 30, Wanda Roderick died and her children were injured when their Ford Explorer
went over the outside shoulder drop-off and overturned when she attempted to return to the traffic
lane.


 Roderick’s accident occurred on the northbound side of the interstate about 1/4 mile south
of the Golden Triangle Boulevard exit. Measurements of the shoulder edge at this location
indicated a drop-off in excess of 2 ½ inches (63.5 millimeters).
      Ruby Martinez died and a passenger suffered injuries on June 3 when Martinez’s Ford Taurus
went over the inside shoulder drop-off and overturned when she attempted to return to the traffic
lane.


 Martinez’s accident occurred on the southbound side of the interstate in the same vicinity
as Roderick’s.


 A witness to the accident estimated in his deposition that the shoulder drop-off
at this location was between 4 and 5 inches (101.6 to 127 millimeters).
      Jaclyn Jimenez suffered injuries on June 17 when her Mitsubishi Eclipse went over the outside
shoulder drop-off and overturned when she attempted to re-enter the traffic lane.


 Jimenez’s
accident occurred on the southbound side of the interstate about 2/10 mile south of Park Glen
Boulevard.
      Hannah Toten died from injuries sustained on June 26 when her Dodge Neon went over the
outside shoulder drop-off and overturned when she attempted to return to the traffic lane.


 
Toten’s accident occurred on the northbound side of the interstate in the same vicinity as
Jimenez’s.


 Appellees provided photographic evidence that the shoulder drop-off at this location
exceeded 2 ½ inches (63.5 millimeters).
      Christie Tarver suffered injury and Michael Sees died on July 2 as a result of a collision
which occurred when Tarver’s Mitsubishi Eclipse went over the inside shoulder drop-off, veered
across the median when she attempted to return to the traffic lane, and collided with Sees’s Honda
Civic.


 Tarver ran off the road in the same vicinity as Roderick.


 A report apparently prepared
by an investigating officer indicates that the drop-off at this location was between 2 and 3 inches
(50.8 to 76.2 millimeters).



      Becky Jones, her daughter, and her daughter’s friend sustained injuries on July 15 when
Jones’s Ford Expedition went over the outside shoulder drop-off and overturned as she attempted
to re-enter the traffic lane.


 This accident occurred on the southbound side of the interstate in the
same vicinity as Jimenez’s.


 The accident report indicates a shoulder drop-off of between 3 and
4 inches (76.2 to 101.6 millimeters).
      Michael Smith suffered injury on August 4 when his Nissan pickup went over the inside
shoulder drop-off on the northbound side of the interstate, overturned as he tried to return to the
traffic lane, slid across the median and the southbound traffic lanes, overturned again, and came
to rest in the grass between the southbound outside shoulder and the southbound access road.


 
Smith estimated the shoulder drop-off to be about 4 inches deep (101.6 millimeters). Smith’s
accident occurred in the same vicinity as the Roderick and Tarver accidents.



      Melissa Gnade and her passenger Michelle Reynolds suffered fatal injuries on August 10 when
Gnade’s Ford Tempo went over the inside shoulder drop-off on the northbound side of the
interstate, crossed the median as she tried to re-enter the traffic lane, and collided with a car
coming in the opposite direction.


 Witness estimates of the shoulder drop-off where Gnade’s car
left the highway varied from 2 to 3 inches (50.8 to 76.2 millimeters). Gnade’s collision occurred
in the same vicinity as the Roderick, Tarver, and Smith accidents.



      The last accident pertinent to this appeal occurred on August 15 when Matthew Merrill’s
Chrysler LHS went over the inside shoulder drop-off on the northbound side of the interstate,
crossed back over both northbound lanes when he attempted to return to the traffic lane, and
overturned several times before coming to rest in the grass beyond the outside shoulder. Merrill’s
wife and daughter suffered injuries in this accident.


 The record is silent regarding any estimate
of the shoulder drop-off where Merrill’s car left the highway. The Merrill accident occurred in
the same vicinity as the Roderick, Tarver, Smith, and Gnade accidents.



Shouldering-Up
      TxDOT inspector Ward indicated in a diary entry for June 15 that he had “mentioned” to
Chavez that, if no shoulder work was to be done for a period of time because the change orders
had not yet been approved, the pavement edges “should probably be” shouldered-up.
      Kortes met with Ward on July 1 to discuss the effect of Change Order No. 1.


 According
to a diary entry by Ward for that date, Kortes informed Ward that he did not believe C-W should
be responsible for shouldering-up the pavement edges apparently because of the cost of materials
needed to do so. Kortes told Ward that, if C-W was required to shoulder-up, it should be paid
additional compensation. Ward advised Kortes as follows:
I told him that the safe passage of Traffic thru Project was his Responsibility and if he
felt he needed to Shldr. up he should do so and he could use the material initially
Removed from Shldrs. I also told him he did not have to Sldr. up full width he could just
bring it out about 1 m from pav. edge.

C-W began shouldering-up the pavement edges on July 7. 
      Additional diary entries by Ward indicate that C-W continued to shoulder-up the pavement
edges throughout July. However, photographic evidence, accident reports, witness statements,
and deposition testimony reflect that none of the shoulders where the accidents occurred was
shouldered-up at the time of the accidents.
THE LITIGATION
      Appellees filed the underlying lawsuits against Appellants seeking to establish their liability
under general negligence theories.


 Appellees contend that Appellants are liable because:
      •    they did not have the discretion or authority to direct or permit C-W or Dustrol to mill
50 millimeters of flexible base from the shoulders before Change Order No. 2 was
executed;
 
      •    they permitted or caused the inside and outside shoulders to be milled at the same time
rather than requiring that one shoulder be restored before work commenced on the
opposite shoulder as Sheet 3D of the TxDot/C-W contract required; and
 
      •    they permitted or caused the shoulders to remain milled to depths exceeding 50
millimeters without requiring the implementation of the traffic safety proposals indicated
in Sheet 14 of the contract.

      Appellants contend in their summary judgment motions that their conduct in this regard is
shielded by official immunity because each of the complained-of acts was within their discretionary
authority and performed in good faith.
STANDARD OF REVIEW
      To prevail on a summary judgment motion, the movants must demonstrate that there are no
genuine issues of material fact and that they are entitled to judgment as a matter of law. See
American Tobacco Co. v. Grinnell, 951 S.W.2d 420, 425 (Tex. 1997); Nixon v. Mr. Prop.
Management Co., 690 S.W.2d 546, 548 (Tex. 1985); Fletcher v. Edwards, 26 S.W.3d 66, 73
(Tex. App.—Waco 2000, pet. denied). We conduct a de novo review in a summary judgment
case. See Macias v. Rylander, 40 S.W.3d 679, 683 (Tex. App.—Austin 2001, pet. denied);
Coleman v. Cintas Sales Corp., 40 S.W.3d 544, 547 (Tex. App.—San Antonio 2001, pet. denied);
Rucker v. Bank One, Tex., N.A., 36 S.W.3d 649, 653 (Tex. App.—Waco 2000, pet. filed). We
disregard all conflicts in the evidence and accept the evidence favoring the nonmovants as true. 
See Great Am. Reserve Ins. Co. v. San Antonio Plumbing Supply Co., 391 S.W.2d 41, 47 (Tex.
1965); Fletcher, 26 S.W.3d at 73. We indulge every reasonable inference from the evidence in
favor of the nonmovants and resolve any doubts in their favor. See American Tobacco, 951
S.W.2d at 425; Fletcher, 26 S.W.3d at 73.
APPLICATION
      Appellants argue in their first issue that the acts of which Appellees complain were
discretionary in nature because they involved professional engineering decisions and because the
shoulder drop-offs at issue did not invoke the safety requirements of Sheet 14. They contend in
their second issue that they performed such acts in good faith.
Official Immunity
      Government employees have official immunity from suit or liability which arises from their
performance of discretionary duties which are within the scope of their authority and which are
done in good faith. See University of Houston v. Clark, 38 S.W.3d 578, 580 (Tex. 2000); City
of Lancaster v. Chambers, 883 S.W.2d 650, 653 (Tex. 1994). Whether a governmental action
is a discretionary function is a question of law. See State v. Miguel, 2 S.W.3d 249, 251 (Tex.
1999) (per curiam).
      In the context of highway construction projects, decisions about highway design and what type
of safety features to employ “are discretionary policy decisions.” Id. However, the
implementation of these policy decisions at the subordinate or operational level is a ministerial
function not shielded by official immunity. See State v. Terrell, 588 S.W.2d 784, 787-88 (Tex.
1979); McClure v. Reed, 997 S.W.2d 753, 756 (Tex. App.—Tyler 1999, no pet.); Mitchell v. City
of Dallas, 855 S.W.2d 741, 745 (Tex. App.—Dallas 1993), aff’d, 870 S.W.2d 21 (Tex. 1994).
      Because official immunity is an affirmative defense, Appellants must conclusively establish
each element of their immunity claim. See Clark, 38 S.W.3d at 580.
Discretionary or Ministerial Acts?
      As the Supreme Court explained in Miguel, “Decisions about highway design and what type
of safety features to install are discretionary policy decisions.” Miguel, 2 S.W.3d at 251. TxDOT
policies and procedures clearly vest TxDOT’s Executive Director and his authorized
representatives with the discretion to effect changes in construction plans “at any time during the
work.” See Texas Dep’t of Transp, Standard Specifications for Construction and
Maintenance of Highways, Streets, and Bridges item 1.21, at 3, item 4.2, at 19-20 (1995). 
Thus, we agree with Appellants that their conduct in proposing and executing the change orders
at issue in this case falls within the category of “discretionary policy decisions” “about highway
design” contemplated by Miguel.



      Regarding the implementation of the traffic safety proposals contained in Sheet 14, Appellants
contend that “the field personnel were acting as authorized representatives of the Engineer” and
had the discretion not to implement these proposals because the drop-offs at issue were “two
inches or less.” They acknowledge that there was an “occasional variance” from this depth but
assert that such variances did not “change the overall treatment of the job, for engineering
purposes, as being equivalent to 50mm/2 inches.” They cite Miguel for the proposition that “field
personnel” acting in this capacity have discretion regarding whether to implement traffic safety
proposals contained in the plans.
      For shoulder drop-offs of 50 millimeters or more, Sheet 14 required the establishment of a
0.620-meter-wide “buffer zone” along the shoulder-side of the traffic lane, marked off by 100-millimeter-wide white or yellow stripes and vertical panels. Sheet 14 also required that the
contractor “shoulder up” against the pavement edge at the end of each day in areas where such
depths were present.
      Appellants presented evidence of a policy in the Fort Worth TxDOT district that no safety
precautions are required when shoulder drop-off depths are 50 millimeters or less. They refer to
this as the “Fort Worth policy.” They contend that field personnel have the discretion to decide
whether a particular shoulder drop-off is sufficiently shallow to apply this policy and employ no
safety precautions. They aver that the exercise of such discretion is the type of policy-making
discretion contemplated in Miguel. We disagree.
      The Supreme Court has described the type of discretionary acts protected by official immunity
as follows:
Ordinarily, official immunity extends to any action or decision by a state employee that
is “discretionary.” Discretionary functions receive protection, but ministerial duties do
not. This distinction is admittedly problematic. We have explained the distinction as
follows:
 
Ministerial acts are those “[w]here the law prescribes and defines the duties to
be performed with such precision and certainty as to leave nothing to the
exercise of discretion or judgment . . . but where the act to be done involves the
exercise of discretion or judgment, it is not to be deemed merely ministerial” .
. . . If an action involves personal deliberation, decision and judgment, it is
discretionary; actions which require obedience to orders or the performance of
a duty to which the actor has no choice, are ministerial.
 
However, other courts have noted that most duties involve some measure of
discretion, including purely ministerial duties. Labelling an act as discretionary is
“probably only a shorthand notation for a more complex policy decision.”

Kassen v. Hatley, 887 S.W.2d 4, 9 (Tex. 1994) (citations omitted).
      We have little doubt that engineers, inspectors, and contractors do and must exercise some
measure of discretion in the field when deciding how to implement highway construction plans and
whether the circumstances require the use of traffic safety precautions specified by those plans. 
However, the exercise of such discretion is not the type of “complex policy decision”
contemplated in Kassen. Rather, these are operational-level implementation decisions for which
the decision-maker can be held liable. See McLure, 997 S.W.2d at 756; Mitchell, 855 S.W.2d at
745.
      At a minimum, the summary judgment evidence produced by Appellees raises a fact issue
regarding whether the various shoulder drop-offs at the accident sites were 50 millimeters or
greater. Sheet 14 imposed several safety requirements for shoulder drop-offs of such depth. The
record establishes that none of these requirements was met with regard to the drop-offs at issue.
      Because Appellants’ decisions regarding whether to employ the safety precautions required
by Sheet 14 are not the type of discretionary decisions protected by official immunity and because
the record raises a genuine issue of material fact regarding whether the drop-offs at issue
implicated the requirements of Sheet 14, we conclude that Appellants failed to establish as a matter
of law that their conduct in this regard is shielded by official immunity. Accordingly, Appellants’
first issue is without merit. 
      In light of this holding, we need not address Appellants’ second issue.
      We affirm the orders denying Appellants’ summary judgment motions.

                                                                               REX D. DAVIS
                                                                               Chief Justice
Before Chief Justice Davis,
      Justice Vance, and
      Justice Gray
Affirmed
Opinion delivered and filed August 22, 2001
Publish